[No. 34689. Department Two. April 23, 1959.]

MOSES DINNER *et al., Appellants,* v. DONALD J. THORP,
*Respondent.*[1]

[1]Reported in 338 P. (2d) 137.

*Maslan, Maslan & Hanan* and *Bernard D. Greene,* for appellants.

*Rosling, Williams, Lanza & Kastner,* for respondent.

HUNTER, J.—This is a malpractice action instituted by plaintiffs Moses Dinner and Myra Dinner, husband and wife, against the defendant Dr. Donald J. Thorp.

On October 25, 1955, Mrs. Dinner engaged the defendant doctor, a specialist in obstetrics and gynecology, to care for her during her second pregnancy and to deliver her expected child. At the time she consulted the doctor, she had been in a pregnant condition for four months and informed him that her first pregnancy had resulted in a normal birth without complications and that she had developed diabetes since the birth of her first child. Dr. Alice Hildebrand, her internist, also informed the doctor that the plaintiff had a mild case of diabetes.

Mrs. Dinner remained under the care of Dr. Donald J. Thorp until time for the birth of her child, when the doctor attempted a normal delivery which failed because of the large size of the child. It weighed eleven pounds and died during the attempted delivery. Plaintiffs then brought this malpractice action against the defendant doctor. The action was based upon the alleged fact that he did not exercise the requisite degree of skill ordinarily exercised by those specializing in his profession practicing in the same or similar community.

Plaintiffs allege that the defendant was negligent in failing to recognize the effect that diabetes of the mother would have in increasing the size of the baby; that he negligently failed to take proper precautions or proper X rays to determine the size of the baby in order to determine the proper method of delivery; that he negligently attempted to make normal delivery of the child when he knew or, in the exer-

cise of. reasonable care, should have known that the child was too large for such a delivery; that he negligently and carelessly failed to deliver the child by caesarean section when he knew or, in the exercise of reasonable care, should have known that the child was too large to permit a normal delivery from the mother.

Plaintiffs seek damages for the death of the child in one cause of action, and for injuries sustained by the mother in the second cause of action, all asserted to be proximately caused by the foregoing alleged negligence of the defendant doctor. The jury returned a verdict in favor of the defendant, and the plaintiffs appeal from the judgment entered thereon.

Appellants assign error to the limitation by the court of their use of recognized medical texts on cross-examination of an expert witness of the respondent; to certain instructions given by the court; and to the failure of the court to give certain proposed instructions of the appellants.

It is appellants' theory, as supported by the testimony of Dr. Charles S. Fine, their expert witness, that diabetes of the mother, regardless of its severity, has a tendency to result in the diabetic mother producing a very large child. Also, that pregnant mothers in a pre-diabetic state show a similar tendency to large children; that diabetes of a mother in any degree creates a threat of certain obstetrical problems which requires extra care, attention, and caution.

On the other hand, it is respondent's theory, as supported by his expert witnesses, that there are two distinct categories of diabetes—the juvenile or severe type of diabetes which must be controlled by insulin, and the adult or mild type of diabetes which is usually controlled by diet alone. Dr. Robert N. Rutherford, respondent's expert, testified that a mother with a severe type of diabetes has a tendency to develop an unusually large child, whereas mothers with a mild type, controlled by diet alone, have no such tendency and that the obstetrical care in the latter type is the same as given to normal pregnant mothers. Upon the cross-examination of Dr. Rutherford relative to this theory of the re-

spondent, appellants' counsel attempted to elicit from him that there is a tendency in diabetic mothers to produce large children, regardless of the severity of diabetes. In pursuing his cross-examination of Dr. Rutherford on this theory, appellants' counsel attempted to question the doctor relative to certain excerpts contained in Greenhill on Obstetrics, 11th Edition, published by W. H. Saunders, which Dr. Rutherford admitted to be a standard text on obstetrical matters. Upon objection to such an examination being sustained, the appellants' counsel, in the absence of the jury, sought the court's permission to examine the witness in the following manner:

"Q. Now, Doctor, referring to Page 139, I will ask you if this statement from Greenhill is or is not a proper statement: 'The fetal factors responsible for fetal loss are: (1) Increased fetal size, . . .'

"[Statement to the court] Well, here on Page 140 under the heading 'The Prediabetic State and the Large Infant'— there was some testimony by this witness as to the prediabetic state—it reads, 'The tendency for diabetic mothers to have large infants and increased infant deaths has also been noted for mothers in whom diabetes subsequently develops. A prediabetic state of about ten years prior to its development has a definite bearing on the increased incidence of large infants. . . .' And then the following: 'Jackson stated that 62 per cent of his diabetic mothers had at least one child that was above 4535 gm. (10 lbs.) as compared to the 12 per cent in a control group.' It is exactly in line and I offer to ask both these questions of this witness. . . ."

It was respondent's further contention, as supported by this witness, that there was some danger attendant to the use of X rays in the examination of a pregnant mother and that information obtained from an X ray of a fetus is of no importance to an obstetrician in making a determination of the size of the baby.

Appellants' counsel sought permission, in the absence of the jury, to question this expert witness on cross-examination as to his knowledge of the certain statements reading from the same medical text, which we quote from the record in part as follows:

" 'To Determine the Size of a Baby. This is important in women with irregular menstrual histories, in those who have not been seen during the early months of pregnancy and also in women with diabetes. In many women who have diabetes the baby grows excessively; this may be a cause of dystocia. Roentgenography may be used to determine the size of the head, the degree of opening of the fontanels and the thickness of the skull bones. It also discloses the amount of the baby's subcutaneous fat which may be excessive, for example, with diabetic mothers. The information obtained may be of assistance in determining when to terminate pregnancy and when to do a cesarean section.'

"It fits right down the aisle, your Honor, and I have a right to ask that."

Appellants' counsel further sought permission, in the absence of the jury, to cross-examine Dr. Rutherford relative to his knowledge of certain excerpts from *Greenhill, supra*, concerning his testimony that it was a potential hazard to take a child by caesarean section, from which we quote in part as follows:

"At the Sloane Hospital in New York the last death directly attributed to cesarean section occurred in 1941. During the following seven years, 1266 cesarean sections were done with only one death and it was not attributable to the operation. These statistics and those from the Chicago Lying-In Hospital indicate that cesarean section performed by specialists carries practically no risk of death.

"D'Esopo analyzed the incidence of cesarean section in ten of the largest hospitals of the United States and found that the average incidence was 4.9 per cent. The experience at the Sloane Hospital indicates that it is not any more hazardous to the mother to deliver her by cesarean section than by vaginal operation. . . ."

The court sustained the objection to the reading of the foregoing excerpts of testimony, as well as others which the appellants attempted to use for cross-examination purposes in this manner, for the reasons advanced by the respondent that this was an attempt on the part of the appellants to prove their case by the use of medical texts contrary to the rule announced in the case of *Skodje v. Hardy*, 47 Wn. (2d) 557, 288 P. (2d) 471 (1955); and that the excerpts from the text related to severe diabetes and not to mild diabetes

which is controlled by diet alone. Further, that in the case of the statistics read from the medical text this was hearsay twice removed.

■ Appellants contend the court erred in so limiting their counsel's cross-examination of the expert witness. We agree. The appellants were entitled to test the accuracy of the opinions expressed by respondent's witness on these controversial issues in the case by this examination of the expert on his knowledge of statements contained in the recognized standard text. *Skodje v. Hardy, supra,* relates to the use of text materials as a substitute for medical testimony and is not apposite here. The rule is correctly stated in *Clukey v. Seattle Electric Co.,* 27 Wash. 70, 67 Pac. 379 (1901), which the trial court recognized but, in effect, denied appellants its benefit. In that case, we said:

" . . . The sixth assignment embraced an objection to the manner in which the attorney for respondents conducted the cross-examination of the medical experts appointed by the court. The counsel asked the expert if such authorities did not lay down certain rules,—reading the language of the rule from the author's work,—and it is contended that it is an infraction of the rule of evidence against the admission of medical authorities. But we do not think the rule of law was announced to meet the practice of the kind complained of. These questions were propounded upon cross-examination for the purpose of testing the knowledge of the expert. It would have been competent for the attorney to have stated supposititious cases to the experts. He could properly have stated the rule from memory, asking the expert if such an author did not lay down such a rule. It seems there could be no tenable objection to his reading the rule to the expert. In fact, it is a more exact method and less liable to make a wrong impression on the mind of the juror, than to cross-examine from memory."

■ The answer to the objection that the medical text is hearsay is contained in the following opinion from our sister state of Oregon, *Kern v. Pullen,* 138 Ore. 222, 6 P. (2d) 224 (1931):

" 'The objection to such procedure upon the ground that it violates the hearsay rule and permits the use of opinions which are not subject to cross-examination is unsound, or

else it proves too much. If the opinion of one who is an authority is not to be used at all, unless the author of it be sworn and be subject to cross-examination, by what logic can the same inadmissible opinion be used as a basis for the admissible opinion of the expert witness? The opinion of the expert, qualified by study, is admitted as an exception to the hearsay rule. It is known to be founded upon the assertions of others: 1 Wig. Ev., s. 687. Whether it shall be admitted or rejected depends on the witness' familiarity with the hearsay. Unless he is thoroughly versed in that hearsay, he is not qualified to testify. The reasoning of courts excluding inquiries about the authorities, upon the cross-examination of the expert, leads directly to the conclusion that the opinion of the expert should have been excluded. If the cross-examination puts before the jury the unsworn opinion of the authority, the direct testimony of the expert does the same thing, with the added infirmity involved in his recollection of what the authorities say. * * * . . . Neither the illogical rule that hearsay should be received upon the direct testimony of an expert and excluded from his cross-examination, nor the idea that all expert opinion should be excluded because it violates the hearsay rule, has been adopted in this state. Opinions are here received whenever it appears that they will be helpful. * * * And since the opinions are received, the just and reasonable corollary is that their value is open to investigation. The opponent may be permitted to test this value for various reasons and in various ways. There may be occasion to inquire whether the opinion is an honest one. Does it really express the views of the witness? If it be honest, does it represent the unanimous hearsay conclusion, or only a fragment of it? Has the witness made himself familiar with all the useful hearsay upon the subject, or only a part? Having testified to the sum of the useful hearsay, he may justly be inquired of touching the units of which the sum is composed.' *Laird v. Boston and Maine R. R.*, 80 N. H. 377 (117 Atl. 591)."

In this state we have followed the rule that cross-examination of an expert witness should be liberalized rather than restricted. In *Levine v. Barry*, 114 Wash. 623, 195 Pac. 1003 (1921), we stated:

" . . . The expert witness, because of his superior knowledge of the subject about which he is testifying, may be a very useful or a very misleading, or even dangerous,

witness, and as to him the rules of cross-examination should be liberalized rather than restricted. We think the general practice in the trial courts of this state has been in accordance with the views we have announced and that such practice has grown up because it tended to bring about justice. Of course, the rule may be, and in fact often is, abused, but the trial court is always in position to stop the abuse. The rule is not to be condemned because of the inclination to abuse it, when the remedy is at hand."

We find no abuse of the rule by the appellants in the instant case. The appellants were so circumscribed by the trial court's limitation of the cross-examination of the expert on the crucial conflicting theories of the case as to constitute reversible error.

■ Appellants assign error to the court's instruction No. 14, which reads as follows:

"By undertaking professional service to a patient, a physician and surgeon specializing in a particular branch of the medical and surgical science impliedly represents that he possesses and will exercise, and the law places upon him the duty to possess and exercise, *that degree of skill and learning ordinarily possessed and exercised by the average physician engaged in the same line of practice and practicing in this or similar communities.* If he fails to possess such skill or knowledge, or, possessing it, fails to exercise it with reasonable care, he is guilty of malpractice and is liable in damages to anyone who may be injured or damaged as a proximate result thereof." (Italics ours.)

The instruction correctly states the rule except that it has a tendency to be misleading by the use of the language italicized above. This may be construed to relate to the skill and learning of an average physician, rather than to a physician *specializing* in the same line of practice in the same or similar communities. *Atkins v. Clein*, 3 Wn. (2d) 168, 100 P. (2d) 1 (1940). We do not approve the instruction as given.

■ Appellants assign error to instruction No. 15, which reads:

"A physician is not liable for damages consequent upon an honest mistake or an erorr in judgment in making a diag-

nosis or in determining upon a course of procedure where there is reasonable doubt as to the nature of the physical conditions involved. If a physician brings to his patient care, skill, and knowledge he is not liable to the patient for damages resulting from his honest mistakes or a bona fide error of judgment. The law requires a physician to base any professional decision he may make on skill and careful study and consideration of the case, *but when the decision depends upon an exercise of judgment the law requires only that the judgment be made in good faith.*" (Italics ours.)

The instruction as framed is misleading. The italicized portion indicates to the jury that the exercise of judgment in good faith alone absolves the respondent from liability, irrespective of his exercise of such skill and learning as is usually used by physicians specializing in obstetrics, gynecology and diseases of women, practicing in the same or similar communities. *Atkins v. Clein, supra.* The instruction as given is incorrect.

■ Appellants assign error to the failure of the court to give appellants' proposed instruction No. 2, which reads:

"The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of expert witnesses. A person who by education, study and experience has become an expert in any art, science or profession, and who is called as a witness, may give his opinion as to any such matter in which he is versed and which is material to the case. You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound."

The respondent contends this instruction does not apply in malpractice cases where the jury must depend on expert evidence; that it, in effect, authorizes the jury to disregard the expert and substitute their own judgment. We disagree. A similar argument was advanced in the case of *Wilcox v. Carroll*, 127 Wash. 1, 219 Pac. 34 (1923), where a like instruction was given. There we said:

"Appellant contends that, while this instruction may have been proper in certain cases, it was improper in this; that,

in order to find for respondent herein, there must be testimony of medical experts showing that appellant was guilty of malpractice; therefore, the only testimony which could possibly support a verdict for respondent must be of medical experts. It is also contended that, unless the jury followed the evidence of the experts, there was nothing before them, because the evidence necessary to prove the case must be given by medical experts, citing *Wilkins' Adm'r v. Brock*, 81 Vt. 332, 70 Atl. 572; *McGraw v. Kerr, supra*.

"Admitting, as does appellant, that this instruction is correct as an abstract matter of law, there is abundant reason for the giving of it in this case. All the experts for appellant admitted that moving the patient around was highly dangerous, and that giving him food was highly dangerous, and yet they stated as their conclusion that the treatment given by appellant was the correct treatment. *Moreover, the fact that the expert witnesses for appellant did not agree* upon the affirmative defense pleaded by appellant as to the matter of putting the child in the care of allopathic physicians after it had been treated as it was treated by appellant, rendered this instruction proper and applicable to this case." (Italics ours.)

There is a dispute in the medical testimony in the instant case. The trial court erred in failing to give this requested instruction as to the manner in which the jury should consider opinion evidence.

In view of our disposition of the assignments of error thus far and the necessity for a new trial, comment on appellants' remaining assignments of error is unnecessary.

For the reasons heretofore stated, the judgment entered upon the verdict of the jury should be reversed, and the case remanded for a new trial.

It is so ordered.

WEAVER, C. J., and ROSELLINI, J., concur.

HILL and DONWORTH, JJ., concur in the result.

---

June 17, 1959. Petition for rehearing denied.