

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 0 7 2014

Madsen C. J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 AM on Aug. 7, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 89369-1 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| EDWIN TROY HAWKINS, | ) | |
| | ) | Filed ___AUG 0 7 2014___ |
| Petitioner. | ) | |
| | ) | |

OWENS, J. — After a defendant is convicted of a crime, the trial court may order a new trial if the defendant produces newly discovered evidence that is material and could not have been discovered with reasonable diligence and produced at trial. CrR 7.5(a)(3). We give a trial court a great deal of deference when it orders a new trial because it is in the best position to weigh the evidence and because it has no incentive to crowd its docket with frivolous retrials. Here, the trial court granted a new trial after Edwin Troy Hawkins produced new evidence that supported his defense theory that he was framed for possessing stolen farm equipment. The Court of Appeals did not give that decision its proper deference. We reverse because the trial court did not abuse its wide discretion in awarding Hawkins a new trial.

Separately, we reject Hawkins's claim that the date set for the new trial violated his right to a speedy trial under CrR 3.3 because the 90-day limit for speedy trial purposes commences when the trial court enters a formal order granting a new trial, not when it makes an informal decision.

## FACTS

It is necessary to relate a large portion of the facts in this case to fully analyze the issues related to the new trial. Hawkins was granted a new trial based on newly discovered evidence that supported his defense theory that he was framed. One must understand the following facts of the case in order to evaluate the materiality of that new evidence.

*Hawkins Moves to Washington To Work on an Orchard*

Hawkins met his wife, Britt Hawkins (formerly Britt England), while both were in college. Britt grew up in Manson, Washington, where her family, the Englands, had worked as orchardists for generations. The England family owned and operated several orchards and also ran an apple packing warehouse named Manson Growers. Hawkins and Britt married, finished college together, and moved to Dallas, Texas, where Hawkins worked as a retirement hedge fund manager and Britt worked as a teacher.

After having children, Britt wanted to return to Manson to raise her family in a small-town environment. She purchased a piece of orchard property that her father,

Doug England, and uncle, Len England, operated for two years before the Hawkins family relocated to Manson. Eventually, Britt began leasing several orchards, and her business operated under the name Sundance Slope.[1] Hawkins left his job in the financial sector and began learning the orchardist trade. The learning curve was steep; prior to the relocation he had never even ridden a tractor.

*Conflict with the Englands*

At first, Sundance Slope marketed its apples through Manson Growers, the company owned by the England family. They also bought chemicals through Manson Growers. Within a year or two, Hawkins learned that Manson Growers was allegedly overcharging for chemicals, and he publicly confronted the Englands in front of the Manson Growers Board of Directors. Sundance Slope terminated its business with Manson Growers. This dispute resulted in a loss of business for the Englands and bad blood between the two families that was known in the orchardist community. The trial court excluded all evidence of the feud between the families.

*Hawkins Inspects RLF's Farm Equipment and Declines To Lease It*

When orchard operators lease orchard property, they commonly lease the farm equipment stored on the property as well. Hawkins had such an opportunity when he considered leasing two properties—known as Beebe Ranch and Twin W—that were

---

[1] Britt and Hawkins agreed four years before Britt acquired the orchard to keep their assets separate. Sundance Slope was entirely in her name.

owned by RLF Columbia Land Holdings.[2] RLF stored several pieces of farm equipment on those properties including two Air-O-Fan sprayers, a Kubota 7030 tractor, and a Landini tractor.[3] These pieces of equipment would later go missing, and Hawkins would be charged in connection with their disappearance.

Hawkins inspected the equipment while considering whether to lease the two RLF properties for the 2006 season. Because he was an inexperienced orchardist, he relied on more experienced advisors both times. Alvin Anderson helped him inspect the Kubota and Landini tractors stored on Beebe Ranch. Anderson determined that the Kubota did not function in four-wheel drive. Hawkins did not lease Beebe Ranch or the tractors stored on it. Dale Martin helped him inspect the Air-O-Fan sprayers stored on the Twin W property. Martin determined that the sprayers were "junk." Clerk's Papers (CP) at 747. Hawkins eventually leased Twin W but not the sprayers.

In the summer of 2005, Sundance Slope separately purchased two pieces of equipment to add to its fleet very similar to the RLF equipment it had inspected: a Kubota 7030 (after it was repaired by Anderson) and a Landini tractor.

---

[2] RLF was referred to as different names at different points in the trial but will be referred to hereafter as RLF.

[3] There are other pieces of equipment mentioned in the record, but Hawkins was charged only in relation to these four pieces.

4

*RLF's Equipment Goes Missing*

Robert Morrison worked at Beebe Ranch and Twin W as a type of security guard. His wife worked for the England family at Manson Growers. At the end of the 2005 season, RLF put its equipment into storage at the two properties. Then in the spring of 2006, Morrison noticed that four pieces of farm equipment were missing: two sprayers, the Kubota tractor, and the Landini tractor. He reported the missing equipment to RLF and to the Douglas County Sheriff's Office.

*The Sprayers Are Found after a Tip from Len England*

Morrison testified that in August of 2006, he received a call from Len England, Britt's uncle, who said that he knew where the missing sprayers were and had pictures of them. Len did not tell Morrison who took the pictures, and he asked Morrison not to tell the police that he provided the information that led to the sprayers. Morrison reported the tip to the police, and they found the sprayers on property leased by Sundance Slope. Hawkins told police that he did not know who owned the sprayers or why they were on the property. No charges were filed at the time.

Gloria Bailey would later testify at trial about an incident involving the area where the sprayers were found. She lived very close to where the sprayers were recovered. She testified at trial that several days before police recovered the sprayers she saw a blue Ford pickup with a loaded trailer drive to the site very late at night.[4]

---

[4] Morrison owned a blue Ford pickup truck.

After several minutes she became curious—she turned on her outside lights and walked out to see what the truck was doing. When her lights turned on, the truck—and the now-empty trailer—sped away. She testified that before that incident the sprayers were not on the property. While she did not enter Sundance Slope's property afterward to see if the truck had dropped anything off, the implication of her testimony was that someone planted the sprayers on Sundance Slope's property.

*Police Investigate Hawkins's Shop; It Is Burglarized the Next Day*

On October 24, 2006, two Chelan County police officers arrived at the Hawkins home and Britt gave them permission to inspect their farm equipment as part of the RLF investigation. The officers searched the shop for approximately 90 minutes and inspected Sundance Slope's equipment (including Sundance Slope's Kubota and Landini tractors). As part of their investigation, they compared the serial numbers of the missing equipment to the Hawkins equipment. The officers found no sign of the missing RLF equipment.

The next day, the Hawkins shop was broken into. A large tool box and a file containing equipment records, receipts, and tractor part numbers were taken during the break-in. Britt and Hawkins reported the break-in and theft to Chelan County.

*Hawkins Brings His Kubota Tractor in for Repairs; It Is RLF's Missing Tractor*

In spring, at the start of the 2007 growing season, Hawkins experienced trouble with his Kubota tractor. It had been stored for the winter after a curious episode

6

during the previous season. After the key had gone missing, the tractor had been found away from the farm, stopped in the middle of the road, and out of diesel fuel. Now out of storage, the tractor would not start and had problems with its four-wheel drive. Anderson—the man who helped Hawkins inspect RLF's equipment and later to buy a Kubota 7030 tractor—tried to repair the tractor, and he testified that it was not the same tractor that he had previously helped Hawkins purchase and repair.

Hawkins took the tractor to be repaired at a shop. The shop employees noticed that the serial number had been ground off and the identification plate was missing. They were able to determine that the tractor was the missing RFL Kubota and contacted the police. When Hawkins returned to pick up the tractor, he was arrested. Hawkins testified that he did not know why he was arrested and was never given paperwork detailing the charges. After he was released on bail, he went back to the shop and loaded up the tractor. He testified that he learned of the charges only when the police stopped him again as he drove home with the tractor.

*Detective Dale England Gets Involved*

One other England family member played a role in this case—Dale, a detective with the Chelan County Sheriff's Office. In the fall of 2007, Dale contacted a Douglas County officer about the missing Landini tractor. He asked the officer to stop one of Sundance Slope's trucks that was transporting a tractor to check if it was the missing RLF Landini. The police stopped the truck but did not find RLF's

Landini tractor. Later, Dale again contacted the Douglas County officer, claiming to know about serial numbers being ground off tractors. The Douglas County officer contacted Dale's source for the information, and the source denied knowing anything about the allegations.

*The Charges, Trial, and Appeal*

The State charged Hawkins with four counts related to the stolen farm equipment. The State charged one count of first degree possession of stolen property for the sprayers and one count for the Landini tractor.[5] It charged one count of first degree attempted possession of stolen property based on Hawkins's attempt to pick up the Kubota tractor from the repair shop and another count of first degree possession of stolen property based on when he actually did pick up the tractor. The jury convicted him of only the two charges related to the Kubota tractor.

At trial, Hawkins was not allowed to introduce evidence of the dispute between his family and the Englands. This seriously hampered his defense theory that someone—most likely encouraged or aided by the England family—framed him by planting the sprayers and switching the other equipment. Hawkins appealed, arguing that he should have been allowed to introduce the evidence. The Court of Appeals

---

[5] Morrison discovered the missing Landini tractor, parked on the side of the road next to property owned by Sundance Slope. He checked the engine number himself, claimed that it matched the serial number of RLF's missing Landini, and reported it to the police. The jury acquitted Hawkins of the charge related to the Landini.

8

agreed with him that the exclusion was error but held that it was harmless. *State v.
Hawkins*, 157 Wn. App. 739, 752-53, 238 P.3d 1226 (2010) (*Hawkins* I). The court

reasoned that none of the evidence linked another person to the Kubota tractor, and

Hawkins was convicted only of the charges related to that tractor. *Id.* at 753.

*Newly Discovered Evidence Leads to a New Trial; the Court of Appeals Reverses*

While the case was on appeal, Martin—the man who helped Hawkins inspect

the sprayers at Twin W—remembered an episode regarding the Kubota tractor. He

submitted a declaration that read in part:

> In spring 2007 I was at the Sundance Slope orchard to pick up a
> fertilizer spreader. At that time I observed a white flatbed truck arrive at
> the orchard's equipment loading area. The truck was carrying a large
> orange Kubota tractor. I saw the driver unload the Kubota. A short time
> later I saw the truck leave the property loaded with an orange Kubota.
> No one else was present at the time. I knew Troy Hawkins and was
> familiar with his employees. The driver was not Hawkins and was not
> one of the employees. This event did not stand out in my mind because
> it is common to see orchard equipment moved around during the
> growing season.

CP at 1106. Martin also declared that he did not know of the charges concerning the

Kubota tractor at the time of trial and testified regarding only the sprayers. Armed

with this new evidence, Hawkins moved for a new trial.

The trial court granted the motion for a new trial while the appeal was still

pending. The court recognized that Martin had already testified and that if the right

question had been asked, Hawkins could have discovered the new evidence earlier.

But it went on to say that it "cannot see where the Defendant or his attorney had any

reason to believe that Mr. Martin may have observed what he did." *Id.* at 1129. Thus, it found that Hawkins exercised the due diligence necessary to warrant a new trial. These observations were noted in a document titled "Decision on Motion for New Trial." CP at 1127-31.

The State appealed, and the Court of Appeals reversed in an unpublished opinion, holding that a new trial was not warranted because it believed that Hawkins could have discovered the evidence before trial with due diligence. *State v. Hawkins*, noted at 175 Wn. App. 1046, 2013 WL 3777099, at *3 (*Hawkins* II). We granted review. *State v. Hawkins*, 179 Wn.2d 1008, 316 P.3d 494 (2014).

## ISSUES

1. Did the trial court abuse its discretion when it ordered a new trial based on newly discovered evidence?

2. Did the 90-day speedy trial limit commence when the trial court entered a decision on the motion for a new trial or when it entered a formal order granting a new trial?

## ANALYSIS

*1. The Trial Court Did Not Abuse Its Discretion in Granting Hawkins a New Trial*

We review a trial court's decision whether or not to grant a new trial for abuse of discretion. *State v. Williams*, 96 Wn.2d 215, 221, 634 P.2d 868 (1981). A trial court's wide discretion in deciding whether or not to grant a new trial stems from "the

oft repeated observation that the trial judge who has seen and heard the witnesses is in a better position to evaluate and adjudge than can we from a cold, printed record." *State v. Wilson*, 71 Wn.2d 895, 899, 431 P.2d 221 (1967). We have given even greater discretion to decisions to grant a new trial. *State v. Brent*, 30 Wn.2d 286, 290, 191 P.2d 682 (1948) ("[A] much stronger showing of an abuse of discretion will ordinarily be required to set aside an order granting a new trial than one denying a new trial."). This policy makes sense, as trial courts have a strong interest in preserving the finality of their judgments as well as preventing their dockets from becoming overcrowded with meritless retrials.

The Court of Appeals erroneously failed to acknowledge the heightened level of deference given to a decision to grant a new trial. The trial court was intimately familiar with this complex case that involved many characters, properties, and pieces of orchard equipment. It was in the best position to decide whether the newly discovered evidence warranted a new trial. As the appellate court, we will not overturn that decision unless the State makes a clear showing that the trial court has abused its wide discretion. The State has not made such a showing.

CrR 7.5 governs motions to grant a new trial. It states in relevant part:

> The court on motion of a defendant may grant a new trial for any one of the following causes when it affirmatively appears that a substantial right of the defendant was materially affected:
>
> . . . .

11

. . . Newly discovered evidence material for the defendant, which the defendant could not have discovered with reasonable diligence and produced at the trial.

CrR 7.5(a)(3). The trial court found that the newly discovered evidence was material, and, as noted above, it found that Hawkins exercised due diligence and still could not have discovered the evidence. Those findings were not an abuse of discretion.

The new evidence is material. According to the Court of Appeals, Hawkins was erroneously precluded from fully arguing his theory of the case that someone—most likely encouraged or aided by the England family—planted the stolen equipment on his property. *Hawkins* I, 157 Wn. App. at 752. At the time, the Court of Appeals held that the error was harmless because nothing linked the alleged setup to the Kubota tractor, but this new evidence provides that link.

The trial court correctly noted that this new testimony is as material as that of Bailey, who witnessed the blue Ford pickup drop off a trailer load where the Air-O-Fan sprayers were later found. Report of Proceedings (Sept. 27, 2010) at 28. The jury heard that testimony and returned a verdict of not guilty on the charges connected to the sprayers. It is reasonable to conclude that the new evidence would similarly cast doubt on Hawkins's guilt in regard to the Kubota tractor.

That conclusion is especially reasonable when considered with the other evidence in this case that supported Hawkins's theory that he was framed. That evidence includes a business and personal rivalry between Hawkins and the Englands,

Len England's anonymous tip about the sprayers, Bailey's testimony about a truck dropping off a load where the sprayers were found late at night, Detective Dale England's involvement in the subsequent investigation that resulted in false leads about missing serial numbers, the episode where Sundance Slope's Kubota key went missing and the tractor was driven down the road until it ran out of gas, and the shop burglary where a file detailing Sundance Slope's equipment was taken. The newly discovered evidence is material to his defense theory that he was erroneously kept from arguing at trial.

Having found that the new evidence is material, the question becomes whether the evidence could have been discovered before the trial with due diligence. The trial court found that it could not, and that finding was not an abuse of discretion. This case is very complex and involves several pieces of farm equipment. Hawkins had no reason to believe that Martin had seen someone switch the Kubota tractor. Martin testified only in regard to the Air-O-Fan sprayers, and he declared under penalty of perjury that he knew nothing about the charges involving the Kubota tractor at the time of trial. The trial court took him at his word, and the trial court is in the best position to judge a witness's credibility. We reverse the Court of Appeals and hold that the trial court did not abuse its discretion in awarding a new trial.

## 2. *The Date Set for Trial Did Not Violate Hawkins's Speedy Trial Rights*

Hawkins argues that the charges should be dismissed with prejudice because he alleges that the date for the new trial violates his speedy trial rights. Hawkins filed his motion for a new trial on August 25, 2010, while the case was still on appeal. The trial court held a hearing in September, and then it issued a written document titled "'Decision on Motion for New Trial'" on October 7, 2010. CP at 1277. The court stated that it did not intend for that document to constitute a written order. The State attempted to set a date for entry of an order granting a new trial, but Hawkins argued that the court did not have the power to do so while the case was on appeal. As such, no formal order was entered at that time. On April 13, 2011, the Court of Appeals issued a mandate in the case terminating review. On July 11, 2011, Hawkins appeared in court for a trial setting, and the court scheduled trial to begin on September 13, 2011. On August 30, 2011, the trial court entered its formal order granting a new trial. The order included findings of fact and conclusions of law, and incorporated by reference the earlier "decision." Hawkins appealed the date for the new trial, arguing that it violated his speedy trial rights, and the Court of Appeals rejected his claim. *Hawkins* II, 2013 WL 3777099, at *4-5.

The constitutional right to a speedy trial is codified in the Superior Court Criminal Rules. CrR 3.3(b)(2)(i) states that a defendant who is not in custody must be brought to trial within 90 days of the "commencement date." The commencement

date resets to zero in two instances relevant to this case: (1) when a court enters an "order" granting a new trial and (2) the first appearance by the defendant after the superior court receives the appellate court's mandate or other order terminating review or stay. CrR 3.3(c)(2)(iii), (iv).[6] Hawkins argues that the trial court's Decision on Motion for New Trial constituted an order and therefore commenced the 90-day speedy trial window. We disagree.

The application of the speedy trial rule to a specific set of facts is a question of law reviewed de novo. *State v. Swenson*, 150 Wn.2d 181, 186, 75 P.3d 513 (2003). This court interprets court rules the same way it interprets statutes, using the tools of statutory construction. *See State v. George*, 160 Wn.2d 727, 735, 158 P.3d 1169 (2007) ("[T]his court gives effect to the plain language of a court rule, as discerned by reading the rule in its entirety and harmonizing all of its provisions.").

---

[6]The full language of the relevant portion of CrR 3.3(c) is as follows:

> (2) *Resetting of Commencement Date.* On occurrence of one of the following events, a new commencement date shall be established, and the elapsed time shall be reset to zero. If more than one of these events occurs, the commencement date shall be the latest of the dates specified in this subsection.
>
> . . . .
>
> (iii) New Trial. The entry of an order granting a mistrial or new trial or allowing the defendant to withdraw a plea of guilty. The new commencement date shall be the date the order is entered.
>
> (iv) Appellate Review or Stay. The acceptance of review or grant of a stay by an appellate court. The new commencement date shall be the date of the defendant's appearance that next follows the receipt by the clerk of the superior court of the mandate or written order terminating review or stay.

The rule plainly states that an "order" granting a new trial must be entered before the commencement date will reset. CrR 3.3(c)(2)(iii). The decision in this case—which the court never intended to constitute an order—more closely resembled an informal memorandum decision rather than a formal order.

We have previously distinguished between memorandum decisions and formal orders. In *Nicacio v. Yakima Chief Ranches, Inc.*, 63 Wn.2d 945, 948, 389 P.2d 888 (1964), we said, "A memorandum opinion is not an order. It is an expression of the court's intention relative to the issue. The issue is not resolved until an order is entered." The same logic applies here where the trial court issued a decision expressing its intention to grant a new trial, but it did not enter a formal order until after it received the mandate from the Court of Appeals. That formal order is the proper commencement date for speedy trial purposes, and the trial date was within the 90-day limit from that date.

Furthermore, the trial court's actions were understandable, given that it could not enter a formal order granting a new trial while the case was on appeal without the appellate court's permission. RAP 7.2(e). That rule allows trial courts to hear postjudgment motions after review has been accepted, but limits the trial court's power to enter a formal decision. It states in relevant part:

> The postjudgment motion or action shall first be heard by the trial court, which shall decide the matter. If the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the formal

entry of the trial court decision. A party should seek the required permission by motion.

*Id.* Despite the decision by the trial court in his favor, Hawkins never moved the Court of Appeals for permission to enter a formal order granting a new trial. In fact, he objected when the State attempted to set a date for entry of a formal order, which would have commenced the speedy trial limit much earlier. When the Court of Appeals learned of the decision to grant a new trial, it sent a letter directing that no formal order could be entered without the Court of Appeals' permission. Hawkins never moved for that permission, and therefore the trial court could not enter a formal order that would have commenced the speedy trial limit.

Finally, the parties argued below that CrR 3.3(c)(2)(iv) could set the commencement date at Hawkins's first appearance after the mandate (July 11, 2011). The Court of Appeals rejected that argument, reasoning that the rule is intended only for decisions that result in the need for a new trial. *Hawkins*, 2013 WL 3777099, at *5. Regardless of whether that is true, the new trial was scheduled within 90 days of that date and therefore Hawkins's speedy trial rights would not be violated even if that date served as the commencement date. We affirm the Court of Appeals on this issue and hold that Hawkins's speedy trial rights were not violated.

## CONCLUSION

The trial court did not abuse its discretion in awarding Hawkins a new trial. The Court of Appeals did not give proper deference to the trial court's ruling that the

evidence was material and could not have been discovered and produced at trial using reasonable diligence. We reverse the Court of Appeals on this issue. However, the time set for the new trial did not violate Hawkins's right to a speedy trial under CrR 3.3. Under that rule, a defendant must be brought to trial 90 days from when a *formal order* is entered granting a new trial, not 90 days from when the trial court issues an informal opinion expressing its intention to grant a new trial. We affirm the Court of Appeals on this issue.

WE CONCUR: