IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ANNETTE BAUGHMAN, individually and as guardian of E.S. and M.S., minors; | ) ) ) | No. 71835-5-I |
| | ) | DIVISION ONE |
| Respondent, | ) ) | |
| v. | ) ) | |
| | ) | UNPUBLISHED OPINION |
| GROUP HEALTH COOPERATIVE, a Washington corporation, | ) ) | FILED: August 10, 2015 |
| | ) | |
| Appellant. | ) | |
| | ) | |

BECKER, J. — In a medical negligence trial, the standard of care instruction is erroneous if it favors the position of one side over the other on a contested factual issue. Where the error is preserved by a proper objection and the instruction is prejudicial in the circumstances of the case, a trial court does not abuse its discretion in granting a motion for a new trial.

Late one afternoon in December 2010, a seven-year-old girl was taken to an urgent care clinic operated by appellant Group Health Cooperative in Bellevue. It was too late to get her in to see her regular Group Health doctor. The girl came in with a complaint of pain upon urination and blood in her urine. She was seen by Dr. Donald Milligan, a physician employed by Group Health at

the urgent care clinic. Dr. Milligan is a board-certified pediatrician. He does not have specialized training in emergency medicine.

Dr. Milligan collected a urine sample, did a physical examination, and documented redness and an abrasion at the opening of the vagina, "including one area which was quite excoriated." He diagnosed a urinary tract infection. That diagnosis was later borne out by the culture of the urine sample. To treat the infection, Dr. Milligan prescribed antibiotics and topical treatment. He did not ask questions to determine the cause of the excoriation. He did not suspect sexual abuse as the cause. Consequently, Dr. Milligan did not explain to the girl's guardian or note in the girl's record that her symptoms might have been the result of sexual abuse.

In November 2011, it was discovered that the girl and her sister had been victims of sexual abuse on an ongoing basis both before and after the girl's visit to the urgent care facility. This negligence lawsuit was filed shortly thereafter. The complaint alleges a failure by Group Health and its agents to implement and follow proper procedures for recognizing the signs of child sexual abuse.

The expert witnesses presented competing testimony about the standard of care. The plaintiff presented two physicians who specialized in emergency medicine. One of these, Dr. Richard Cummins, explained that in teaching emergency medicine, he asked his students to look for the differential diagnosis—not just the most reasonable explanation of the symptoms presented, but also the most serious explanation.[1] He testified that the symptoms of a

---

[1] Report of Proceedings (Jan. 29, 2014) at 31-40.

2

urinary tract infection seen in this case were also red flags for sexual abuse and that the possibility of sexual abuse should have been considered. The patient could have been asked, "Tell me about getting this owie . . . . Did somebody touch you there in a way that made you uncomfortable?'" Depending on what emerged from the question, Dr. Cummins said, the guardian could have been advised to follow up on the possibility of sexual abuse.

Dr. Cummins was asked to talk about "the standard of care of a reasonably prudent physician in an urgent care setting." His opinion was that the standard of care was not met in this case because indicators of sexual abuse were present but not recognized or dealt with. He also gave his opinion that if Dr. Milligan had recognized and dealt with the possibility of sexual abuse, the sexual abuse would have been detected then, rather than a year later. This opinion was based on the fact that the girl readily disclosed sexual abuse a year later when she was asked about it.

Dr. Cummins' opinion was shared by Dr. Marianne Gausche-Hill, an emergency medicine specialist with a subcertification in pediatric emergency medicine. She testified that "for a complaint like this," the standard of care for a physician in an urgent care facility is equivalent to the standard of care in an emergency room. The standard requires doctors to go through a differential diagnosis, in other words to "think broadly" and not minimize possibilities but rather "assume the worst."[2] The question was not whether the girl had a urinary tract infection—she definitely did. The question was whether the infection

---

[2] Report of Proceedings (Jan. 30, 2014) at 223.

3

originated in an innocent way or whether, particularly in view of the excoriation seen at the entrance to the vagina, there had been some rubbing or scraping that might be attributable to sexual abuse. That issue, according to Dr. Gausche-Hill, should have been explored in an open-ended way, the family should have been counseled about it, and the primary care provider should have been alerted to provide follow-up.[3]

Pediatricians who were presented by Group Health as expert witnesses, on the other hand, testified that under the circumstances, Dr. Milligan was not obligated to consider the possibility that sexual abuse caused the infection. Dr. Lori Frasier, a board-certified pediatrician subspecializing in child-abuse pediatrics, testified that the standard of care was to look for a "'unifying diagnosis'"—"the single diagnosis that will treat and cure the problem." Dr. Frasier was asked to speak in terms of how "actual pediatricians, general pediatricians" handle the kinds of symptoms Dr. Milligan saw. Based on her experience "both as a general pediatrician and being involved in directing or overseeing the clinic of other general pediatricians," Dr. Frasier concluded that Dr. Milligan's examination was thorough and detailed—"a good, high standard examination."[4]

Dr. Astrid Heger, also a board-certified pediatrician subspecializing in child-abuse pediatrics, was asked by defense counsel to give a definition of the standard of care "for a pediatrician as you've seen it used in your institution."[5]

---

[3] Report of Proceedings (Jan. 30, 2014) at 273-277.
[4] Report of Proceedings (Feb. 10, 2014) at 995-96.
[5] Report of Proceedings (Feb. 11, 2014) at 1097-98.

4

She responded that the standard of care calls for pursuing the most logical diagnosis first, which in this case was the urinary tract infection. Dr. Heger said that if she had been in Dr. Milligan's position, she would not have tried to "flesh out" the possibility of sexual abuse by asking the child questions. Nothing in the visit, she said, "would have precipitated a report for child sex abuse out of my clinic."

The plaintiff in an action for professional negligence must show that the defendant health care provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1). Two pattern jury instructions on the standard of care of a health care provider have been adopted. One is on the negligence of a general health care provider; the other is on the negligence of a health care provider who is a specialist. 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.01; 105.02 (6th ed. 2012) (WPI). The parties and the court worked with WPI 105.02. In the context of this case, the key language of that pattern instruction is as follows:

> A (fill in type of health care provider) who [holds himself or herself out as a specialist in (fill in type of specialist)] [assumes the care or treatment of a condition that is ordinarily treated by a (fill in type of specialist)] has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent (fill in type of specialist) in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question. Failure to exercise such skill, care, and learning constitutes a breach of the standard of care and is negligence.

WPI 105.02.

5

Dr. Milligan's board certification was in pediatrics, but he was practicing in an urgent care clinic. The first version of the instruction the court considered tracked WPI 105.02. It reflected the plaintiff's theory that Dr. Milligan should be held to the standard of care of an emergency medicine physician:

> A pediatrician who holds himself out as a specialist in Emergency Medicine has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent Emergency Medicine physician in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question.

Group Health proposed a second version of the instruction that eliminated the phrase "who holds himself out as a specialist in Emergency Medicine" and replaced it with "who works in Emergency Medicine." Baughman did not object to that change.

Group Health then proposed a third version of the instruction. The third version changed the standard of care from what is "expected of a reasonably prudent Emergency Medicine physician" to what is "expected of a reasonably prudent pediatrician in an urgent care/emergency room setting." Baughman objected to this change at length. The trial court nevertheless decided to use the third version, stating that "your distinction is actually lost on me." Thus, the final version given to the jury was as follows:

INSTRUCTION NO. 7

A health care provider owes to the patient a duty to comply with the standard of care for one of the profession or class to which he or she belongs.

A pediatrician practicing in an urgent care/emergency room setting has a duty to exercise the degree of skill, care and learning expected of a reasonably prudent pediatrician in an urgent care/emergency room setting in the state of Washington acting in the same or similar circumstances at the time of the care or treatment in question.

Failure to exercise such skill, care and learning constitutes a breach of the standard of care and is negligence.

The degree of care actually practiced by members of the medical profession is evidence of what is reasonably prudent. However, this evidence alone is not conclusive on the issue and should be considered by you along with any other evidence bearing on the question.

The jury returned a verdict for Group Health on the question of negligence. Baughman moved for a new trial, alleging that instruction 7 misstated the law. The trial court granted the motion. Group Health appeals.

A decision to grant a new trial will be reversed if it misapplies the law or is predicated on incorrect legal principles. We afford greater deference to a decision to grant a new trial than we do a decision to deny a new trial. Kuhn v. Schnall, 155 Wn. App. 560, 570-71, 228 P.3d 828, review denied, 169 Wn.2d 1024 (2010). Jury instructions must properly inform the jury of the applicable law and permit each party to argue his or her theory of the case. Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002).

In granting the motion for a new trial, the trial court concluded that instruction 7 was erroneous for the reasons stated in Richards v. Overlake Hospital Medical Center, 59 Wn. App. 266, 796 P.2d 737 (1990), review denied,

116 Wn.2d 1014 (1991), and <u>Dinner v. Thorp</u>, 54 Wn.2d 90, 338 P.2d 137 (1959).

In <u>Richards</u>, a family medicine practitioner was providing pediatric care at the time of an alleged malpractice. Over the plaintiff's objection, the trial court gave the following instruction:

> "A physician who is a family practitioner has a duty to exercise the degree of skill, care and learning of a reasonably prudent family practitioner in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question. Failure to exercise such skill, care and learning is negligence.
> If a family practitioner holds himself out as qualified to provide pediatric care, or assumes the care or treatment of a condition which is ordinarily treated by a pediatrician, he has a duty to possess and exercise the degree of skill, care and learning of a reasonably prudent family practitioner in the State of Washington acting in the same or similar circumstances at the time of the care and treatment in question. Failure to exercise such skill, care and learning is negligence."

<u>Richards</u>, 59 Wn. App. at 276. The <u>Richards</u> court held the second paragraph was erroneous because it prevented the jury from choosing to apply the standard of care of a pediatric specialist:

> Instruction 7 given by the court deprived the jury of the determination of whether Dr. Haeg should be held to the standard of care of a reasonably prudent family physician or to the standard of a reasonably prudent pediatrician, because the instruction as given assumed that regardless of the conclusion of the jury, Dr. Haeg was to be judged by the standard of care of a family practitioner.

<u>Richards</u>, 59 Wn. App. at 276. An analogous problem occurred in <u>Dinner</u>. In that case, a standard of care instruction misleadingly suggested that a specialist could be held to the standard of care of an "average physician" when practicing within his board certified specialty. <u>Dinner</u>, 54 Wn.2d at 97.

Here, instruction 7 was similarly misleading. The instruction expressed the standard of care in a confusing composite phrase—"the degree of skill, care and learning expected of a reasonably prudent pediatrician in an urgent care/emergency room setting." The trial court recognized the problem when orally ruling on the motion for a new trial:

> Next issue is whether there's any factual evidence supporting plaintiffs' proposed alternative to the Court's No.7. This indeed was a contested factual issue at trial and the plaintiff did produce—introduce evidence that, if believed by a jury, supports the proposition that the doctor held himself out to be a specialist ER doctor and that the urgent care center was the equivalent of an emergency room. This was a contested issue.

The trial court correctly concluded instruction 7 misstated the law.

A court will find an instructional error harmless if it had no effect on the verdict or did not deprive a party of her theory of the case. Estate of Dormaier ex rel. Dormaier v. Columbia Basin Anesthesia, PLLC, 177 Wn. App. 828, 861, 313 P.3d 431 (2013). Group Health argues instruction 7 was harmless because the plaintiffs' expert witnesses testified that all physicians, whatever their specialty, should be trained to recognize indicators of sexual abuse. On its face, this argument has some weight, but it ignores the discretion a trial court has in deciding whether to grant a motion for a new trial. The trial judge who has seen and heard the witnesses is in a better position to evaluate whether a new trial is warranted than an appellate court reviewing a cold transcript. State v. Hawkins, 181 Wn.2d 170, 179, 332 P.3d 408 (2014).

Here, the trial judge heard competing testimony about the applicable standard of care. The plaintiff's expert witnesses were emergency room physicians. They testified that the differential diagnosis methodology—"assume the worst"—is the standard of care to be employed in the practice of emergency medicine. The defendant's expert witnesses were pediatricians. They testified that pediatricians satisfy their standard of care by using the unifying diagnosis methodology that zeroes in on the most likely explanation for a patient's symptoms.

The trial court also listened to the closing argument, in which Group Health repeatedly emphasized, using PowerPoint slides, that the plaintiff's witnesses were not pediatricians.

> The experts that we have called and had testify and tell you their opinions in this case, three out of four are pediatricians, three out of four are child abuse experts. Plaintiffs' experts: No pediatricians, no child abuse specialists.

Group Health used this point to exploit the advantage created by instruction 7. Calling the jury's attention to instruction 7, counsel argued that only the defense experts were discussing the appropriate standard of care:

> Pediatricians are to be judged based on the way reasonably prudent pediatricians care for patients in this kind of urgent care setting. The only people we have had who have told you what pediatricians do are—I mean, the actual people who were pediatricians, every single one of them have been defense experts and they have all told you that what was done was reasonable and appropriate under the circumstances, and in fact, what they would do in their facilities.

The closing argument demonstrates how instruction 7 allowed Group Health to marginalize the testimony of the emergency room physicians. The

10

effect of the instruction was to endorse the standard of care presented by the pediatrician witnesses. As the trial court saw it, Group Health "attacked the reliability of the plaintiffs' experts, because they were not pediatricians like the defense experts." The instruction not only misstated the law but prejudicially undermined the plaintiff's ability to present her theory of the case. The trial court was within its discretion to find the instructional error warranted a new trial.

Group Health also claims that Baughman did not adequately preserve the instructional error raised in her motion for a new trial. We disagree. The key factual issue involved in Baughman's objection to the final version of instruction 7 was whether Dr. Milligan should be held to the standard of care of an emergency room physician. Baughman did not explicitly cite Richards, but she did employ its reasoning:

> I think the word "pediatrician" there should be "physician." That's from the WPI instruction, and the reason that instruction is given, Your Honor, is that when someone from a different specialty fills a role other than they would typically fill, that's when this instruction is given.
>
> So to use a really extreme example, if they decide to staff their emergency department with an allergist, that allergist isn't held to the standard of care of an allergist in the emergency department. He's held to the standard of care of a reasonably prudent emergency room physician.
>
> And so I think this is the defendant's modified language, but *it guts the instruction of its intended meaning by saying that a pediatrician has to perform to the standard of care of a pediatrician. The point of the instruction is to tell the jury that the pediatrician, if he's going to be practicing in an emergency room, he has to practice to the same standard as an emergency room physician, and not the same standard as a pediatrician. That doesn't make any sense.*

(Emphasis added.)  This was sufficient to preserve the instructional error raised in Baughman's motion for a new trial.  <u>Washburn v. City of Federal Way</u>, 178 Wn.2d 732, 746-49, 310 P.3d 1275 (2013).

 Affirmed.

WE CONCUR:

Becker, J.

Jau, J.

Schindler, J.