
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SHELLY M. BALSER, individually, and | ) | |
| JOHN BALSER, individually, and their | ) | No. 31567-3-III |
| Marital community, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| PROVIDENCE HEALTH & SERVICES, | ) | |
| a Washington Corporation d/b/a | ) | |
| MOUNT CARMEL HOSPITAL | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Providence Health appeals the trial court's decision to grant a new trial due to a failure of discovery concerning experiments undertaken by one of its experts that were related to the jury during the expert's testimony. Given the great deference owed a trial judge's discretion in this arena, we affirm.

## FACTS

Respondent Shelley Balser and her husband (collectively, Balsers) sued Providence Health and Services over injuries suffered after physical therapy treatment at Mount Carmel Hospital in Colville. Following a change of venue, the matter ultimately proceeded to a jury trial in Spokane County Superior Court.

The case revolved around a claim by the Balsers that Shelley Balser had been injured during physical therapy for "tennis elbow" at Mount Carmel. Physical therapist Thomas Kaluzny provided electrical muscle stimulation (EMS) treatment using the "Russian electrical stimulation" method. EMS involves use of electricity to simulate muscle contractions. The Russian method used by Mr. Kaluzny places one electrode in the middle of a muscle and one at the top of the muscle tendon. An electrical current was then allowed to flow from one electrode to the other for alternating periods of ten seconds.

The April 19, 2005, treatment session involved Mr. Kaluzny placing a pair of electrodes on Ms. Balser's biceps and a pair on her trapezius. When properly applied, this combination should cause the shoulder to lift or shrug. Mr. Kaluzny testified that he placed one of the trapezius electrodes on the midsection of the upper trapezius and the other at the top of the tendon of the deltoid muscle. His standard practice was to make sure the EMS was causing the muscle to contract and the patient was comfortable, and then he would leave the room during the duration of the treatment, typically 20 or 30 minutes.

About five or ten minutes after he turned on the Dynatron EMS machine, observed it working appropriately, and left the room, Ms. Balser experienced dizziness and her heart started pounding. She got up and looked for help. Mr. Kaluzny returned and discovered that Ms. Balser's pulse rate was 152 beats per minute and she had high blood pressure. He told her husband to take her to the hospital, where they gave her oxygen and

2

diagnosed her with tachycardia. Ms. Balser also complained of a dry mouth and tight neck. After conferring with Mr. Kaluzny, the emergency room doctor concluded that the symptoms may have been caused by EMS stimulation of the vagus nerve coming from the brain. Ms. Balser's heart rate and blood pressure eventually returned to normal and she was discharged.

Over the following months, Ms. Balser continued to have a dry mouth, anxiety, and periods when she felt she could not breathe; she occasionally reported heart palpitations. Her symptoms eventually improved somewhat with medication, but she remained anxious about recurrences. In July 2005, a fellow physical therapist brought Ms. Balser a Dynatron manual that warned against placing one of its electrodes near the stellate ganglion, a cluster of nerves in the hollow above the clavicle next to the side of the neck. Ms. Balser did some internet research and decided that her symptoms could be explained by injury to the stellate ganglion on the right side of her neck. Contrary to Mr. Kaluzny's memory, she contended that he had placed an electrode at least partially over the hollow above the clavicle, rather than over the deltoid. By stimulating that hollow area, she contended, the EMS damaged nerves in the stellate ganglion that serve her salivary glands and heart.

The Balsers deposed physical therapist James Strandy, an expert for Providence Health. At one point in the deposition, counsel for Providence Health asked Mr. Strandy, "In addition to the records, literature and your experience, have you also performed any kind of work or experimentation relative to Russian electrical stimulation?" He

3

responded, "Yes." Ms. Balser did not specifically ask Mr. Strandy what experiments he had performed, but she did ask what facts supported his opinion, what research he had done on EMS and Russian stimulation, and what he meant by "research." "[A]re you talking about you get articles, you read them, or are you talking about you give treatment to people, keep track of it, and then publish literature?" Mr. Strandy responded to the last question by stating, "Yes, to the former. No, on the latter." Clerk's Papers (CP) at 135.

Mr. Strandy testified at trial concerning the standard of care for physical therapists, including proper use of the Russian method, but Providence Health established that Mr. Strandy was not offering a causation or diagnostic opinion. Providence Health asked him to explain what research he had done. He answered, "I was curious myself to see whether or not the electrode placement in this dip or hollow of the neck would produce" the contracting shoulder movements Mr. Kaluzny and Ms. Balser had described. Later in his testimony, Mr. Strandy reported that he had experimented with the Dynatron EMS machine on an office assistant and had determined that placing one of the trapezius electrodes over the hollow of the clavicle could not have caused Ms. Balser's shoulder to lift. With one electrode over the upper trapezius and one over the clavicle hollow, Mr. Strandy's assistant reported she felt only nerve tingling and numbness. On cross-examination, Ms. Balser asked Mr. Strandy if he had revealed in his deposition that he had made this experiment. He answered, "You didn't ask [me] that question, but you did ask me if you were to put

4

that electrode in that area, what would you feel, and so I was waiting for you to ask me how do you know that, and you didn't." Report of Proceedings (RP) at 1042.

The court asked the jurors if they had any questions at the end of Mr. Strandy's testimony. Three of the four questions submitted by the jurors involved the "experiment":

[1] Since you were willing to "experiment" on your assistant to see if you could induce movement in the shoulder by placing an electrode in the triangle, is it fair to assume that you were not concerned with creating injury to her cervical ganglia? [2] Was the assistant . . . afraid to have her stellate ganglion damaged to test the hypothesis of achieving a shoulder shrug? [and 3] Did your assistant experience any side effects after placing electrode in "Triangle Area" such as increase [sic] blood pressure, tachycardia, dry mouth, or any other sympathetic system symptoms? How long was the machine left turned on with electrode in that "Triangle Area?"

CP at 31-33.

The parties debated the issue outside the presence of the jury. The Balsers objected to the questions on several bases, including the fact that the "experiment" had not been disclosed at the deposition. Providence Health contended that it put the Balsers on notice when it asked whether Strandy had performed an experiment. The court declined to ask the three questions, but noted that the whole issue was "out there because the jury already knows something." RP at 1078.

The jury concluded that Providence Health was not negligent. The Balsers moved for a new trial under CR 59(a), contending that the failure to disclose the experiment in discovery deprived them of a fair trial. The trial court granted a new trial, concluding that

5

Providence Health should have disclosed the information, it was material because it addressed the central issue the jury had to resolve, and the Balsers were prejudiced by the misconduct.

Providence Health timely appealed to this court.

## ANALYSIS

Providence Health challenges the new trial ruling, arguing on multiple bases both that the court abused its discretion in ordering the new trial and that the Balsers waived the issue by not timely objecting at trial. We will address the two issues in the order noted.

*New Trial Motion*

Providence Health argues that it did not violate its discovery obligations and for that reason, as well as lack of prejudice, the court erred in granting the new trial. We address those arguments as one related issue.

Providence Health recognizes the well settled standards that govern this case. A ruling on a motion for a new trial under CR 59(a) is reviewed for abuse of discretion. *Teter v. Deck*, 174 Wn.2d 207, 222, 274 P.3d 336 (2012). A higher showing of abuse of discretion applies to an order granting a new trial than to an order denying such a motion. *Id.; State v. Hawkins*, 181 Wn.2d ---, 332 P.3d 408 (2014). Discretion is abused when it is exercised on untenable grounds or untenable reasons. *Teter*, 174 Wn.2d at 222; *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

No. 31567-3-III
*Balser v. Providence Health Servs.*

The Balsers sought a new trial under the provisions of CR 59(a)(1), (2), and (9),

which provide in part that a new trial may be granted due to:

(1) Irregularity in the proceedings . . . ;
(2) Misconduct of prevailing party . . . ;
(9) That substantial justice has not been done.

The court's order expressly cited all three bases as support for its ruling. CP at 325.[1]

Providence Health argues that it did not fail to disclose Mr. Strandy's experimentation

and that the Balsers simply did not ask the right questions during the deposition. Like

the trial court, we disagree. As detailed previously, when Mr. Strandy was asked the basis

for his expert opinion, he mentioned "research." He subsequently defined "research" as

reading the literature rather than treatment and patient follow-up. CP at 135. However,

he subsequently used his undisclosed experimental efforts to explain that the plaintiffs'

theory of the case could not be correct.

Providence Health argues that "research" is not "experimentation." That is an

insignificant semantic distinction. Mr. Strandy was asked about the basis for his opinion,

not whether he distinguished "research" from "experimentation." By limiting his answer

to "research," he was then bound by his idiosyncratic view of the meaning of that term. If

---

[1] Providence Health also argues that the trial court erred in granting the new trial as a sanction for violating the discovery rules. The court's ruling only addressed the effect of the surprise testimony under CR 59(a) rather than the discovery rules. We cannot read this record as establishing that the trial court treated this as a discovery sanction. The issue was the effect of the surprise testimony on the trial rather than whether discovery obligations were ignored. We will not separately address the discovery violation claim.

7

what he views as "experimentation" was not a basis for his opinion, then he should not have been telling the jury about his "experiment".[2] If his opinion of what "research" meant changed between the deposition and trial to include an "experiment", the defense needed to disclose the new basis for his opinion.

The trial court correctly decided the experiment needed to be disclosed to the plaintiffs before trial. The question remaining is whether this "misconduct" justified granting a new trial. Providence Health argues that this undisclosed testimony was not prejudicial because all of the experts agreed that placing the electrodes in the wrong locations would violate the standard of care and cause injury. It also argues that all of the witnesses agreed that Ms. Balser did lift her shoulder when it was stimulated by the machine and that the shoulder movement was not possible if the electrodes were placed where the Balsers said they were.

However, the Balsers did present some evidence that shoulder stimulation could occur if an electrode was placed partly over the deltoid with the rest of it over the stellate ganglion, thus making their theory of the case physically possible. Accordingly, Mr. Strandy's "experiment" was the only expert non-opinion evidence that called into question where the electrode was actually placed. Further, the fact that the subject of Mr. Strandy's

---

[2] While not challenged at trial, Mr. Strandy's "experiment" testimony appears to be outside the expected scope of his testimony. It was used to contradict the plaintiffs' theory of the case rather than explain the standard of care for therapists using the Russian method.

8

"experiment" did not suffer injury called into question the dangerousness of actually stimulating the stellate ganglion. The previously noted questions from the jury all focused on this point, one that seriously undercut the plaintiffs.

Given all of this, the trial court correctly determined that Mr. Strandy's "experiment" went to the issues at the heart of the case. This was a very tenable basis for granting the motion for a new trial. The facts here are more compelling than in other cases where our Supreme Court recently has upheld new trial rulings. In *Teter*, the court upheld a new trial granted due to the exclusion of the plaintiff's only urologist, an expert who was a late addition to the witness list. 174 Wn.2d at 220-22. In *Hawkins*, the court approved a new trial where the defendant failed to question one of his trial witnesses about an incident that other defense witnesses described. 332 P.3d at ¶¶ 19-21.

In both *Teter* and *Hawkins*, the court upheld the grant of new trials on the basis of information the witness might have been able to convey at trial. Here, the question revolved around evidence actually entered at trial on the central point of the case. The impact of this surprise testimony was more significant than the anticipated testimony that justified new trials in the other cases. Accordingly, as we must accord the decision to grant a new trial greater deference than an order denying a new trial, we conclude that the new trial remedy was not an abuse of discretion here.

The trial court did not err in granting the Balsers a new trial.

*Waiver*

Providence Health also contends that the Balsers waived any claim of error by gambling on the verdict before seeking relief. The trial court carefully considered this claim before rejecting it due to the context in which the issue arose at trial and the difficulty of finding a cure.

A party may not gamble on a verdict before seeking to remedy trial misconduct. *Teter*, 174 Wn.2d at 225. The failure to seek relief will only be excused if the misconduct was so flagrant that it was beyond cure. *Id.* at 225-26. Providence Health contends that this rule governs here and that the Balsers are not entitled to a new trial because they did not challenge Mr. Strandy's testimony at trial.

The trial court considered this to be appellant's best argument in opposition to the new trial motion. RP (Aug. 14, 2012) at 31-32. The court pointed out that the issue arose late in the trial in the context of the jury's proposed questions for Mr. Strandy and that perhaps the court and parties "got sidetracked" from addressing the core problem presented. *Id.* at 31. The veteran trial judge admitted that she was uncertain whether or not the error was curable. *Id.* at 32. Left with the overall impression that the testimony was important, making the error highly prejudicial, the court believed that a new trial was appropriate. *Id.* at 32-33.

We believe this was not an instance where the plaintiffs should be faulted for gambling on a new trial, if they even did so. We doubt that anything short of a mistrial

10

could have cured the error given the centrality of the liability issue and the comparative weakness of the Balsers' case on that point. Those facts made the error highly prejudicial. Telling the jury to disregard the testimony would be of dubious value, and there was no time to try to find a competing expert to dispute Mr. Strandy's "experiment." The likely outcome of an objection would have been a new trial.

The purpose of an objection is to allow the trial court to take corrective action to remedy the problem. If the problem cannot be remedied without granting a new trial, then there is no need to object. The problem presented to the trial court was not remediable short of a new trial, which is ultimately the remedy chosen by the trial court. On these facts, we do not believe the waiver rule has application.

The order granting a new trial is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

11