IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75560-9-I |
| | ) | (Consolidated with No. 75661-3-I) |
| Appellant/Cross Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KAMURAN DANIEL CHABUK, | ) | |
| | ) | |
| Respondent/Cross Appellant. | ) | FILED: July 29, 2019 |

SCHINDLER, J. — The State charged Kamuran Daniel Chabuk with assault in the first degree of Joshua Kiener while armed with a firearm. Chabuk asserted he acted in self-defense. The jury convicted Chabuk of the lesser included offense of assault in the second degree while armed with a firearm. The State appeals the trial court's decision to grant a new trial based on pervasive and prejudicial prosecutorial misconduct. In his cross appeal, Chabuk argues his attorney provided ineffective assistance of counsel by not objecting to the misconduct. We affirm the trial court's decision to grant a new trial. We also conclude defense counsel provided ineffective assistance of counsel that resulted in prejudice.

FACTS

On Saturday, May 11, 2013, 30-year-old Joshua Kiener and his friends Todd Buckley and Kyle Walker met for brunch in Bellingham. Kiener, Walker, and Buckley had been friends since high school. Kiener and Buckley do not recall how much they had to drink at brunch. Walker remembered having three drinks. At around 4:00 or 5:00 p.m., they drove to Kiener and Walker's house at 2718 Nevada Street to have a barbeque. Buckley took a nap. Kiener and Walker continued to drink. Laura Smith arrived between 6:00 and 7:00 p.m.

Walker said they drank "champagne and some wine," whiskey, and "there was probably some beers as well." Kiener drank "some whiskey" and "a 6-pack of Rainier tall boys." A "tall boy" is a 16-ounce can of beer.

After barbequing "in the side yard," the group went to the front yard. Buckley and Kiener began "wrestling." Buckley "tackled" Kiener. As he fell to the ground, Kiener pulled a metal gutter off the house. Buckley picked up the metal gutter and "pretended" to swing it at Kiener. The group was very noisy. Walker was making a loud "squawking sound."

Twenty-seven-year-old Kamuran Daniel Chabuk lived in a duplex located at 2633 Nevada Street with his girlfriend Danielle Shook and Angela Ybarra-Dunn and Nicholas Ostrovsky-Snider. Chabuk was a graduate student at Western Washington University and worked as a teaching assistant in the mathematics department. Chabuk had a permit to carry a handgun that he used for target practice.

2

Shook was concerned about their safety while walking the dog on a nearby trail at night. Chabuk agreed to take his handgun when they walked the dog at night. Chabuk carried the handgun in a holster "between my belt and my body."

On the night of May 11, Chabuk and Shook took their dog for a walk at approximately 9:45 p.m. After they returned, Chabuk heard "some kind of a shouting noise" at around 10:30 p.m. that "sounded like the words 'get out.' " Ybarra-Dunn heard "somebody screaming, 'Get out.' " Ybarra-Dunn was worried about the voice she heard and "just felt very startled and felt my heart jump." Shook heard a voice that "sounded really angry and the yelling was continuing, um, so it seemed like there could be a problem." Shook put on her shoes to go outside. Chabuk did not want Shook to go out alone. Chabuk grabbed his cell phone and the flashlight he used to walk the dog. His gun was still in the holster.

Chabuk and Shook walked down the block. Chabuk saw three men and a woman in the front yard of a house. Two of the men were "holding on to some kind of gutter or like a downspout or something, and swinging it at each other." Chabuk used his cell phone to start videotaping. After Chabuk talked to the group, "it was clear" to Chabuk that "they were just drunk, that no one was actually hurt." Chabuk stopped recording and began walking back to the apartment. After a couple of steps, Chabuk realized that Shook was not following him. Shook was still talking to the group, trying to explain why she was worried about the yelling. Chabuk turned back to signal Shook to leave and come with him. As Chabuk and Shook started walking away, Chabuk heard footsteps behind him. Chabuk turned around and saw a tall man, later identified as

Kiener, following him. Kiener is 6 feet 5 inches tall and weighs between 200 and 215 pounds. Chabuk is 5 feet 10 inches tall and weighs approximately 155 pounds.

Kiener thought Chabuk "was doing something . . . suspicious" to Buckley's car as he was leaving. Kiener told Chabuk, " 'Do you want me to fuck you up? Why are you touching my property?' " Chabuk told Kiener, " 'I didn't touch your property.' " But Kiener repeated, " 'I saw you touching my property.' "

As Chabuk and Shook walked toward the apartment building, Kiener continued to follow them. Chabuk said that as he was walking, his shirt caught on his gun holster and he pulled up his shirt to loosen it from the holster. Chabuk testified Kiener said, " 'Oh, you are flashing your Glock.' " As Chabuk turned to face Kiener, he saw Walker approaching. While Chabuk walked away, Kiener continued to accuse Chabuk of touching his property.

Kiener and Walker advanced toward Chabuk "acting very aggressive," accusing him of "touching my property." Chabuk repeatedly told Kiener to "[b]ack off." Chabuk heard Shook yell to Kiener and Walker, " 'He has a gun.' " In response, Kiener said, " 'I don't fucking care.' " Chabuk began recording Kiener and Walker with his cell phone. Chabuk continued to walk backwards and climb the stairs toward the walkway leading his unit of the duplex. Chabuk called out for someone to call 911 "right now." After Chabuk yelled for someone to call 911, Kiener and Walked moved even more quickly toward him. Chabuk warned Kiener to "back off." But Kiener and Walker continued to confront and "pursue" him. Chabuk pulled the gun out of the holster. Kiener said, " 'Come on, take your flashlight out. What, are you going to taze me with that? I see you fucking holding that thing.' "

4

Chabuk fired his gun at Kiener low, toward the ground. Neither Kiener nor Walker reacted. As Kiener continued to advance toward Chabuk, Chabuk yelled, "[B]ack off" and fired his gun again. Kiener did not react and continued to advance toward Chabuk. When Chabuk fired the third shot, Kiener stopped. Chabuk called 911.

Thirty minutes after arriving at the hospital, Kiener's blood alcohol concentration was .25, more than three times the legal limit.

The State charged Chabuk with assault in the first degree of Kiener while armed with a firearm. Chabuk asserted he acted in self-defense.

The two-week jury trial began on November 9, 2015. The State called a number of witnesses to testify, including Kiener, Walker, Buckley, Smith, and Bellingham Police Officer Richard Schwallie. The court admitted more than 100 exhibits into evidence, including the two cell phone videos and the 911 calls.

Kiener testified that on May 11, 2013, he went to brunch with Walker and Buckley and they planned to have a barbeque later at his house. Kiener said they drank alcohol at brunch and continued to drink alcohol at the barbeque.

Kiener testified that while he and Buckley were wrestling, he saw Chabuk and Shook. Chabuk shined a flashlight on them and recorded them with his cell phone. Chabuk asked if they were involved in a domestic dispute. Kiener testified that he and the others made sarcastic comments to Chabuk and Shook.

Kiener said he followed Chabuk and confronted him because Kiener thought Chabuk "was doing something" to Buckley's car. Buckley's car was parked in front of the house near the sidewalk. Kiener said, "I couldn't see exactly what was going on and it looked like he was doing something to the front end of the car, so I got suspicious."

Kiener asked Chabuk, " 'What are you doing? This is my friend's property. What did you do to the car.' " Kiener conceded he "couldn't tell" if Chabuk had actually "done something to the car."

Kiener testified he "started following" Chabuk and Shook as they began walking away. Kiener said he was "20 feet or so" behind them. Kiener testified, "I can't remember . . . how many times I asked them what they were doing or what they did to the car." Kiener testified that he followed Chabuk up the stairs to the duplex building. At that point, he was "10 or 15 feet away" from Chabuk. Kiener testified, "I remember asking [Chabuk] what's going on and he said it's private property and you need to get off the property. I said something like, 'I am not going to go.' " Kiener said, "I remember him pointing something at me and I responded, 'What, are you going to taze me?' Because, apparently, I thought it was a [T]a[s]er. I don't really recall exactly." Kiener testified that he "didn't know what was going on" when he was shot the first time or the second time. Kiener testified, "[T]he one shot I remember is . . . the third shot."

Defense counsel played the cell phone videos during cross-examination.

Each video recording lasts approximately two minutes. The first video is very dark and no one is visible on the recording. Chabuk asks, "What are you guys doing?" There is laughter in the background and someone asks, "Are you taking pictures?" Chabuk says, "It looked like there was some fighting going on. . . . There was some yelling." Someone says sarcastically, "[W]e just murdered a couple children." Shook says, "Seriously, like, we're trying to show concern . . . if there is, like, a domestic situation going on." Someone says in a slurred voice, "I wouldn't worry about us" and, "That's a gutter." Shook says, "I'm not saying you did anything, I'm just making sure—"

when she is cut off by laughter and someone telling Chabuk to "take a picture." The video shows Chabuk is standing on the sidewalk in front of the house. Chabuk asks, "You're gonna wave?" Someone is standing near the front porch and appears to be waving. Several people talk jokingly about the "weird" poses they can do for the camera and the recording stops.

On the second video recording, Chabuk asks, "So what was it you were saying?" Kiener says, "I was wondering why you're fucking touching my property" and, "[Y]ou're a pussy. You're a pussy, right?" Chabuk tells Kiener, "I think you'd better back off." Kiener says, "I don't give a fuck what you think."

Kiener and Walker continue to follow Chabuk. Chabuk turns and asks Kiener, "Do you think the police would be interested in this video?" Kiener said, "I don't give a fuck what the police or you think."

The video shows that as Chabuk continues moving toward his apartment, Kiener and Walker are combative, following him and repeatedly accusing Chabuk of "touching my property." Chabuk continues to deny touching his property. Kiener says, "[T]ake your flashlight out. . . . Come on. What, are you going to taze me with that? I see you fucking holding that thing." Chabuk then says, "This is about as far as I go." Kiener asks, "Why are you touching my property?" Chabuk repeats, "I didn't do that." Kiener responds, "No, seriously, right now, why are you touching my property." Chabuk tells Kiener, "This is my property. You're on private property right now, and I suggest that you leave." Kiener responds, "You were on private property when you touched my shit."

Chabuk calls out, "Do you have a cell phone? Can you please call 911 right now." Kiener then advances toward Chabuk more quickly. Chabuk fires his gun and

yells, "Back off." Kiener says, "Fuck you" as he moves toward Chabuk and Chabuk says again, louder, "Back off." The video shows Kiener advance forward toward Chabuk and say, "You fucking derelict, fuck you." Chabuk fires a second shot. Kiener does not flinch and continues to move toward Chabuk until he is within arm's reach and Chabuk fires a third time.

Kiener testified that he "recognize[d] my voice" on the videos and his "discussion about the touching [of] the property." Kiener admitted the video showed him repeatedly calling Chabuk a "pussy." Kiener testified he called Chabuk a "pussy" because "it seemed like he was avoiding me and my questions, and that seems kind of weak." Kiener admitted that after Chabuk called out to someone to call 911, "I take a step or two forward" toward Chabuk.

Walker testified he was "roughhousing" with Kiener and Buckley after the barbeque and the group was noisy. Walker testified that he did not see Chabuk or Shook do anything to Buckley's car. Walker did not recall following Chabuk to his apartment. Walker testified, "At that point, um, that's where I have a complete blank in memory. Um, the next thing I remember is [Kiener] walking back into the street and at that point realizing he had been shot." Walker estimated that on a scale of 1 to 10, his level of intoxication was 9 "or even" 10.

Bellingham Police Officer Schwallie testified he made "adjustments" to the two cell phone videos to "increase . . . the brightness" and "boost the volume." The court admitted the enhanced cell phone videos into evidence as exhibit 82. Officer Schwallie testified there is a gap of approximately one to two minutes between the two recordings. Officer Schwallie testified about still photographs from the videos. The still photographs

8

show Kiener moving closer and closer to the cell phone camera. Officer Schwallie estimated Kiener was 15 to 25 feet from Chabuk when he fired the first shot. Officer Schwallie said that approximately six seconds passed between the first and second shot. Kiener then "closed considerably" the distance between him and Chabuk until he was 8 to 15 feet away and Chabuk fired the second shot. Officer Schwallie testified Kiener was even closer when Chabuk fired the third shot, approximately 5 to 8 feet.

The defense called Chabuk, Shook, and Ybarra-Dunn to testify. Chabuk testified the "female voice" he heard at approximately 10:30 p.m. sounded "distressed." Chabuk said the noise "sounded like somebody was hurt or in some kind of distress." When he and Shook walked down the block, Chabuk saw "several people standing up in the yard" and "two of the guys" were "holding on to some kind of gutter or like a downspout or something, and swinging it at each other. Chabuk said, "[T]hey were kind of stumbling around. They weren't really stable. Like they were drunk."

Chabuk testified he began recording the group with his cell phone and used his flashlight to illuminate them. Chabuk asked, "[W]hat was going on" and told them it "looked like there was some kind of fighting going on." After "it was clear to me that they were just drunk, that no one was actually hurt," Chabuk stopped recording and started to walk away.

When Chabuk realized Shook was not with him, he returned to get her. When Chabuk and Shook started walking away, Kiener followed them. Kiener said, " 'Do you want me to fuck you up? Why are you touching my property?' " Chabuk believed Kiener was "threat[ing]" him because to "fuck somebody up" means "to hurt them pretty badly." Chabuk testified that he was "concerned" because Kiener appeared to be

9

"[h]ostile," "angry," and "[a]ggressive." Chabuk testified that Kiener insisted, " 'I saw you touching my property.' " Chabuk said he denied touching the property approximately 10 times but Kiener would not believe him.

Chabuk and Shook walked toward their apartment and Kiener and Walker followed them. Chabuk testified that when he pulled up his shirt "caught" on his gun holster, Kiener said, " 'Oh, you are flashing your Glock.' " Chabuk testified that both men "were acting very aggressive," asking Chabuk, " 'Well, come on, what, are you a pussy? Are you a fucking pussy?' " Chabuk testified that he "kept moving backwards" and repeatedly told Kiener and Walker to "back off."

When Chabuk climbed the stairs to the walkway of his apartment, he saw Shook hiding in the bushes nearby. Chabuk testified that Shook shouted, " 'He has a gun' " and Kiener said, " 'I don't fucking care.' " Chabuk said Kiener's response to hearing Shook yell that he had a gun was "scary" because Kiener "just didn't — he wasn't deterred at all" by the fact that Chabuk had a gun. Chabuk decided to record Kiener and Walker with his cell phone a second time. Chabuk testified, "I thought I could — if I start to record and then this will get them to go away."

The defense played the beginning of the second video recording when Chabuk asked Kiener, " '[S]o what were you saying,' " and Kiener responded, " 'I was wondering why you are fucking touching my property. . . . What, are you a pussy? Why are you flashing the flashing light because you are a pussy, right.' " Chabuk testified that Kiener was about 10 feet away and he "felt intimidated, like threatening." Chabuk said, " 'I think you better back off.' " Kiener said, " 'I don't give a fuck what you think.' "

Chabuk testified that when he asked Kiener and Walker, " 'Do you think the police would be interested in this video,' " his intent was to "tell them that I was recording and that I would show it to the police if they didn't leave me alone." Chabuk said he expected Kiener and Walker to "go away" when he mentioned the police. Chabuk said that as he began to climb the stairs to the duplex building, "I was thinking that I would be able to try to get inside my house and then get [in] and lock the door after that." Chabuk did not expect Kiener and Walker to follow him up the stairs. Chabuk testified, "[I]t's a private area. . . . [I]t's a private walkway over to my place and so I — I was hoping that that would keep them from coming any farther." But instead, Kiener told Chabuk, " 'I don't give a fuck what the police or you think' " and followed him up the stairs with Walker behind him, asking, " 'Why were you touching my property.' " Chabuk testified Kiener and Walker were "threatening" him. Chabuk believed "this was like a private area around my home, that they were going to hurt me."

Chabuk testified Kiener and Walker followed him as he continued to walk backwards toward his unit. Chabuk testified that when he reached the end of the walkway, he told Kiener, " '[T]his is as far as I can go.' " Chabuk said Kiener "still kept saying the same thing like, 'Tell me why the fuck you were touching my property.' " Chabuk testified that Kiener "seemed to be getting more angry, more aggressive" than he was at the start of the encounter.

Chabuk testified that "as I was backing up[,] . . . I was getting really scared and I reached back and pulled the pistol out." Chabuk testified that he drew his weapon because "I was scared they were going to hurt me." Chabuk testified, "I was hoping it would keep them away from me[,] from hurting me." When Kiener says, " 'What, are

11

you going to taze me with that,' " Chabuk testified that he "thought that was a taunt" because Shook had already yelled that he had a gun.

Chabuk testified he heard a woman's voice nearby and called out, " 'Does somebody have a cellphone? Can you please call 911.' " At that point, both Kiener and Walker "started moving towards me quickly. . . . [I]t wasn't a sprint but it was fast." Chabuk testified he believed they would have reached him in "[m]aybe a second." Chabuk testified, "I was afraid if I didn't [fire] that they could seriously hurt me or something." Chabuk fired his gun. Chabuk testified that he "fired low" because "I wasn't trying to hurt him. I was just trying to stop them. Keep them away." Neither Kiener nor Walker reacted to the first shot. Chabuk testified, "[T]here was just no reaction in either of them. It was like nothing had happened."

When Kiener continued to move toward him, Chabuk shouted, "[B]ack off" and Kiener said, " 'Fuck you, you fucking derelict.' " Chabuk said Kiener "keep[s] coming" and he fires a second shot "low again." Chabuk said he fired a second time because "I was afraid that they were going to seriously hurt me, and I was trying to stop them to keep them away." Chabuk testified, "[I]t was like the first time. There was just no reaction." When Kiener continued to advance toward Chabuk, Chabuk fired his gun a third time. Chabuk testified that after the third shot, Kiener's "demeanor changed. . . . [H]e wasn't cussing anymore. . . . [H]e didn't sound so angry." Chabuk ran inside his apartment and called 911.

Shook testified that after they walked the dog, she "heard a really loud yell" and then "more yelling and it kind of sounded like somebody was saying, you know, 'Get out', and it was really angry." Shook "decided to go outside to see what was

12

happening." Shook was "worried that there was, um, a potential domestic violence situation going on and I just wanted to see if that was the case or not." Chabuk followed her outside.

Shook testified that when they arrived at 2718 Nevada Street, she saw "two men[ ]rolling around on the lawn" and "a man and a woman on the stairs." Shook said, "It wasn't clear at that point[ ]whether it was violent or just them having fun." Shook testified, "I said something about that I was worried that there was a domestic violence situation going on" but concluded they "were all pretty drunk and that this was just some sort of like really loud wild party."

Shook testified Chabuk "started to walk away" but when he "noticed that [Shook] wasn't following," turned around and walked back toward her. Shook said that when Chabuk walked back, "one of the guys got really upset and said something like what are you doing to my property and, um, then two of the guys kind of like got up and started, ah, moving really quickly towards us." Shook testified that one of the men asked Chabuk, " 'What did you do to my property.' " Chabuk denied touching the property but the man said, " 'I saw you touching it. You touched it.' "

Shook testified that the two men followed them. One of the men was "yelling" and "called [Chabuk] a pussy and he was yelling the F word and he was like 'Why did you touch my property.' " Shook testified that Kiener "said something like 'Go ahead, get your Glock out. You are not going to use it. You are a pussy.' " Shook testified, "I thought that I heard Mr. Kiener say, um, that he was going to like mess [Chabuk] up or something like that. . . . I couldn't hear one of the words. It was like I'm going to blank you up." Shook testified that Kiener was "threatening."

13

Shook testified, "I couldn't understand what was happening and I felt like I had heard . . . one of them mention the Glock and I felt like maybe I should say it again, so I, um, said really loudly he has a gun."[1] Shook testified that Kiener responded, " 'I don't fucking care. He is a pussy. He is not going to use it.' " Shook testified, "I was terrified. I realized . . . he doesn't care that [Chabuk] has a gun so I was really afraid and I started to feel like, um, that's when I started to feel like it was a life and death matter."

While hiding behind the bushes near the apartment, Shook heard Kiener continue to ask, "[W]hy did you touch my property" and heard Chabuk continue to deny touching the property. When she "heard [Chabuk] yell, um, someone call 911," Shook "saw the two guys rush at [Chabuk]." Shook testified that Kiener and Walker were standing "about two arms lengths apart" from Chabuk, "[m]aybe like six feet." Shook heard "a scuffle" and "heard the three shots."

Ybarra-Dunn testified that immediately afterward, Shook told her, " 'Why did this happen? I warned them he had a gun.' "

The court instructed the jury on the charged crime of assault in the first degree with a firearm and the lesser included offense of assault in the second degree. The court used the 11 <u>Washington Practice: Washington Pattern Jury Instructions: Criminal</u> (4th ed. 2016) (WPIC) to instruct the jury on self-defense, including the lawful use of force,[2] the definition of "necessary,"[3] and that the law imposes no duty to retreat.[4] The court rejected the State's request to give a first aggressor instruction.

---

[1] Laura Smith testified that before hearing the gunshots, she heard a woman say, "[H]e has got a gun."

[2] WPIC 17.02, at 268.

[3] WPIC 16.05, at 259.

[4] WPIC 17.05, at 280.

The jury found Chabuk guilty of the lesser included offense of assault in the second degree. Chabuk filed a motion to arrest judgment and a motion for a new trial.

The court denied the motion to arrest judgment. The court granted the motion for a new trial. In an eight-page letter ruling, the court identified the "definite reasons of law and facts" that supported the decision to grant a new trial.[5] The court found the prosecutor misstated the law on self-defense and improperly argued a first aggressor theory by repeatedly asserting Chabuk was responsible for the altercation.

The letter ruling states, "It is the court's firm belief" that "the repeated characterization of Chabuk's actions as falling below his legal obligation at every conceivable point in time," the "repeated misstatements of the concept of alternatives to the use of force by suggesting . . . it was a continuing obligation falling upon Chabuk even before 'the moment of self-defense,' " and "the suggestion that Chabuk was the party responsible for the aggression exhibited by Kiener" was "all prejudicial to such an extent that it would not have been remedied by an objection or curative instruction, and that it affected the jury's verdict."

> A jury is presumed to follow the law as provided by the court, and is instructed that the law is contained not in the argument of counsel but in the instructions provided by the court. But in this case the court is compelled to conclude that the arguments and the questions of the state as outlined herein distracted the jury and misstated the law to such an extent that it is inconceivable that the jury was not prejudiced thereby and without question this had a substantial likelihood of affecting the verdict of the jury. The court also finds that each of [the] matters described herein as prejudicial rose to such a level in both content and frequency that an objection by defense counsel or a curative instruction would have been of no avail.

The court entered "Findings, Conclusions, and Order Granting New Trial and Denying Motion to Arrest Judgment." The order incorporates by reference the letter

---

[5] Emphasis omitted.

15

ruling. The order states, "These Findings of Fact and Conclusions of Law are intended to briefly summarize that opinion letter, but not to supplant it."

The State appeals the Order Granting New Trial. In his cross appeal, Chabuk argues his attorneys provided ineffective assistance of counsel by not objecting to repeated prejudicial misconduct during cross-examination and closing argument.

ANALYSIS

Decision To Grant New Trial

The State contends the trial court abused its discretion by ordering a new trial under CrR 7.5. Under CrR 7.5(a), "The court on motion of a defendant may grant a new trial . . . when it affirmatively appears that a substantial right of the defendant was materially affected." CrR 7.5(a)(2) identifies "[m]isconduct of the prosecution" as grounds to grant a new trial.

We review a trial court's decision whether to grant a new trial for abuse of discretion. State v. Hawkins, 181 Wn.2d 170, 179, 332 P.3d 408 (2014). An abuse of discretion occurs only when no reasonable judge would have reached the same conclusion. State v. Bourgeois, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997). We give even greater deference to the decision to grant a new trial. State v. Lopez, 190 Wn.2d 104, 117, 410 P.3d 1117 (2018); Hawkins, 181 Wn.2d at 179. The wide discretion of the trial court in deciding whether to grant a new trial stems from " 'the oft repeated observation that the trial judge who has seen and heard the witnesses is in a better position to evaluate and adjudge than can we from a cold, printed record.' " Hawkins, 181 Wn.2d at 179 (quoting State v. Wilson, 71 Wn.2d 895, 899, 431 P.2d 221 (1967)).

However, the deferential standard does not apply to questions of law or mixed questions of law and fact where we review the trial court's factual findings for substantial evidence and legal conclusions de novo. Lopez, 190 Wn.2d at 118. "Substantial evidence" is evidence that is sufficient to persuade a rational, fair-minded person of the truth of the finding. Lopez, 190 Wn.2d 116 n.8.

The right to a fair trial is a fundamental right secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington State Constitution. Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); State v. Finch, 137 Wn.2d 792, 843, 975 P.2d 967 (1999). "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). "When deciding a motion for a new trial based on claims of prosecutorial misconduct, the trial court applies the same standard as an appellate court reviewing such claims" under an abuse of discretion standard. State v. McKenzie, 157 Wn.2d 44, 51-52, 134 P.3d 221 (2006); State v. Ish, 170 Wn.2d 189, 195, 241 P.3d 389 (2010).

To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's conduct was both improper and prejudicial. Glasmann, 175 Wn.2d at 704; State v. Lindsay, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014). "Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

A prosecutor has wide latitude in closing arguments to draw and express reasonable inferences from the evidence. State v. Perez-Mejia, 134 Wn. App. 907, 916,

17

143 P.3d 838 (2006). But the prosecutor "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated" and is held to a higher standard than defense counsel. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011); Lindsay, 180 Wn.2d at 442.

To show prejudice, the defendant must demonstrate a substantial likelihood that prosecutorial misconduct affected the jury's verdict. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Where the defendant does not object at trial, any error is waived unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at 760-61. Under this heightened standard, the defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011). The court should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured. Emery, 174 Wn.2d at 762.

### Reasonable Alternatives Argument

The State contends the prosecutor did not misstate the law or mislead the jury on self-defense and reasonable alternatives to the use of deadly force. Chabuk argues the record supports the trial court's findings and the conclusion that the prosecutor repeatedly misstated and misrepresented the law regarding reasonable alternatives to the use of force. "A prosecuting attorney commits misconduct by misstating the law."

State v. Allen, 182 Wn.2d 364, 373-74, 341 P.3d 268 (2015) (citing State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008)).

The use of force is not unlawful if the defendant has a reasonable belief he is about to be injured and uses no more force than necessary "to prevent an offense against his or her person." RCW 9A.16.020(3);[6] State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). A jury evaluates evidence of self-defense both subjectively and objectively. State v. Walden, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997). The jury must consider the apparent threat from the defendant's point of view and what a reasonably prudent person would have done in the defendant's situation. Walden, 131 Wn.2d at 474. "Accordingly, the degree of force used in self-defense is limited to what a reasonably prudent person would find necessary under the conditions as they appeared to the defendant." Walden, 131 Wn.2d at 474. " 'Necessary' means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1). The State has the burden to prove beyond a reasonable doubt the absence of self-defense. State v. Jordan, 180 Wn.2d 456, 465, 325 P.3d 181 (2014). It is improper to shift the burden of proof to the defendant. Warren, 165 Wn.2d at 26-27; State v. Miles, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007).

The State contends the trial court erred by focusing only on the phrase "absolute obligation." The State argues that in context, the argument that Chabuk should have warned Kiener that he had a gun, that Chabuk should have called 911, or that Chabuk

[6] RCW 9A.16.020(3) states that the use of force is lawful

[w]henever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary.

could have diffused the situation by apologizing was appropriate. The State claims the comment that Chabuk had an "absolute obligation" was an isolated remark. The closing argument supports the finding that the prosecutor misled and misstated the law on reasonable alternatives to the use of force.

At the beginning of closing argument, the prosecutor displayed the to-convict jury instruction.[7] The prosecutor told the jury the State proved beyond a reasonable doubt that Chabuk assaulted Kiener and "acted with intent to inflict great bodily harm." But the prosecutor stated that whether Chabuk acted in self-defense as defined in the jury instructions is "what we are going to talk about and that's the issue in this case." Specifically, "really whether the actions the defendant took, the force that he used, whether it was necessary and whether it was lawful and that really is the issue that we are dealing with."

---

[7] The to-convict jury instruction states:

To convict the defendant of the crime of assault in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about May 11, 2013, the defendant assaulted Joshua Kiener;

(2) That the defendant acted with intent to inflict great bodily harm;

(3) That the assault

(a) was committed with a firearm, or

(b) resulted in the infliction of great bodily harm;

(4) That the defendant's actions were not lawful, as defined in these instructions; and

(5) That this act occurred in the State of Washington.

If you find from the evidence that elements (1), (2), (4) and (5), and either (3)(a) or (3)(b) has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of the alternatives (3)(a) or (3)(b) have been proven beyond a reasonable doubt, as long as each juror finds that either (3)(a) or (3)(b) has been proven beyond a reasonable doubt.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any of these elements, then it will be your duty to return a verdict of not guilty.

The prosecutor addressed the lawful use of force[8] and the jury instruction that defined "necessary." Jury instruction 9 states:

> Necessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended.

The prosecutor emphasized the importance of whether there was "no reasonably effective alternative" under the circumstances as they reasonably appeared to Chabuk at the time. The prosecutor then identified "what reasonably effective alternatives could have been embraced by the defendant all the way through this."

> When you look at this in the beginning, this started because he actually intruded on these people's use of their yard. They were in their yard. There was no huge problem going on by any stretch of the imagination. He videotaped them. Filmed them. . . .
> At that point when [Chabuk and Shook] could tell they were being irritated, all they would have had to have done is say, "Look, I'm sorry. I thought there was a problem here. Excuse me. There was not a problem. We heard some shouting and I thought there was a real concern. Please go on and I will leave."
> Instead, he did something, you recall he made this real complicated statement about turning around near the car and that's when [Kiener] thought he had done something to the car. He could have explained that.

---

[8] Jury instruction 8 states:

It is a defense to a charge of Assault in the First Degree and Assault in the Second Degree that the force used was lawful as defined in this instruction.

The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured, by someone lawfully aiding a person who he reasonably believes is about to be injured, in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.

The use [of] force upon or toward the person of another is lawful when used in preventing or attempting to prevent a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary.

The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of the incident.

The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to all charges.

He could have engaged them in a conversation. He could tell they were intoxicated, but he did not try to do that. So what does he do? He goes down and does the same thing that irritated them at the beginning. He starts filming and shining the flashlight at them. He did not look at a reasonably effective alternative.

The prosecutor argued Chabuk could have called 911. The prosecutor pointed out that in the second video recording, Chabuk "calls out, 'Anyone have a phone? Call 911.'" The prosecutor states Chabuk "is the only guy with a phone but he is not using it as a phone"; instead, Chabuk uses his cell phone "to videotape in this case. He is not using it as a phone. He had the lifeline he could have used." The prosecutor argued, "When they started following him, he could have called. He could have called right then. He had a number of minutes that went by. He did not do it."

The prosecutor asserted Chabuk should have told Kiener that he had a gun but instead Chabuk "concealed" the fact that he had a gun.

> When [Kiener] indicated, "You are going to taze me with that," this is a critical factor because he could have told them this is not a [T]a[s]er. He could have pulled the gun out, put his flashlight on it and said, "This is a gun. Tell you what, you keep on coming closer, I'm going to shoot you". He could have given a warning. He did not. He kept this gun a secret.
> Now, he had a permit and we know that it's lawful to bear arms in our state. He had a permit to carry a concealed weapon. It's lawful to carry a concealed weapon but with that comes the right and the responsibility and with those rights to make sure that that gun and the use of that gun, which is a deadly weapon, is going to be used responsibly.
> At this point, he knew [Kiener] was intoxicated. He knew that he thought this was a [T]a[s]er and he hid the fact that this was a gun from him. Do you think that's using all of the effective alternatives that he could have done? Do you think that was necessary that that wasn't one of the main things he could have done? He could have said, "This is a gun" and shot in the ground and said, "Stay away. This isn't a [T]a[s]er". He didn't do that. He didn't do anything, any of those things, and he concealed the fact that he had a deadly weapon and could inflict deadly — a deadly force on [Kiener], which he did. He made a decision not to disclose that.

The prosecutor argued Chabuk had a "heightened responsibility" as a gun owner to "look at reasonable alternatives" to the use of deadly force. The prosecutor told the jury Chabuk had an "absolute obligation" to tell Kiener that he had a gun.

> Our laws allow people to carry firearms, to bear arms. The Constitution allows that. If you get a concealed weapons permit, you can carry a gun and conceal it, but with that comes a great deal of responsibility, and when you decide to strap your gun on and to go out and check on noises in your neighborhood and to be an investigator, to go out and patrol, to be a police officer, you have a much heightened responsibility to make sure you don't harm someone of the public with your gun.
>
> The law allows self-defense and that's certainly a major part of our law, but you have to be responsible and you have to look at reasonable alternatives so that deadly force is not used.
>
> The defendant had many alternatives in this case and he did not use any and the most egregious is that he hid the fact, he hid the fact that he had a gun in his possession and was willing to use it and in fact did. He didn't tell that to [Kiener]. [Kiener] believed it was a [T]a[s]er. And that was something that he had an absolute obligation to do.
>
> The evidence, ladies and gentlemen, is clear. This was more force than was necessary.

In rebuttal argument, the prosecutor reiterated, "[A]ll [Chabuk] had to do was use the phone that he had for the purpose that it was and that was to call and call 911." But "[h]e never did it." The "greatest point" to consider in determining whether there was a "reasonably effective alternative" was that Kiener "believed that this was a [T]a[s]er," Chabuk "concealed the fact that he had a gun," and he "concealed the fact that he had a deadly weapon" in "violation of his responsibility."

> [Defense counsel] can't answer it. He can't answer it the way that he would want to because it's not in favor of Mr. Chabuk. He purposefully hid the fact that this was a gun and then he used it in an effort to stop [Kiener]. . . . That is something that he hid and that was a violation of his responsibility.

23

The findings granting a new trial state, in pertinent part:

> The Court finds that the State's comments in its closing argument inaccurately stated the law and did so to such an extent that a curative instruction would have been to no avail, and that this had a substantial likelihood of affecting the jury's verdict. The state said, in part, '[T]he defendant had many alternatives in this case and he did not use any and the most egregious is that he hid the fact, he hid the fact that he had a gun in his possession and was willing to use it and in fact did. He didn't tell that to [Kiener]. [Kiener] believed it was a [T]a[s]er. And that was something he had an absolute obligation to do."

> Telling the jury that Chabuk had an "absolute obligation" to tell Kiener that he had a gun and that he "was willing to use it" is a misstatement of the law and in fact could have had no effect but to mislead and prejudice the jury. In a self-defense situation, an individual has an obligation to exercise judgment and restraint and use only such force as is necessary under the circumstances, and may use force only if there is no reasonably effective alternative. But the law does not impose an "absolute obligation" to do or say anything specific with respect to the immediate situation confronting the person who is seeking to defend themselves. There is no obligation to warn of the presence of a firearm (or a weapon of any type). Chabuk had the option to do so but had no obligation to say anything whatsoever, and to suggest to the jury that he did have such an obligation — "an absolute obligation" — and that this "absolute obligation" related to specific statements he must make is a misleading and incorrect statement of the law. To tell the jury that Chabuk <u>could</u> have made such statements as one of his available options would have been acceptable, but the state took it to an impermissible level when it imposed this specific legal obligation upon Chabuk.[9]

The trial court also concluded the prosecutor improperly suggested Chabuk had the "legal obligation" to call the police "when he was considering alternatives to the use of force in a self-defense situation."

> [T]he law imposes no obligation to call the police, and for the state to say "if (Chabuk) had done things right that night, he would have called the police" is to tell the jury that he did not fulfill a legal obligation and that is tantamount to saying he affirmatively did something wrong by <u>not</u> calling the police, and that is not the law. The court finds it was prejudicial for the state to tell the jury that Chabuk did not fulfill a legal obligation when no such obligation existed.[10]

---

[9] Emphasis in original.
[10] Emphasis in original.

24

The court concluded the prosecutor improperly shifted the burden of proof:

[A]lthough arguing things which Chabuk could have done was entirely proper, arguing specific things Chabuk was legally obligated to have done, when those things are not supported by the law, was prejudicial and would have the operative effect of reducing, in the mind of the jury, the state's burden of proof by declaring that Chabuk had failed to comply with "obligations" that the law does not impose and that, ergo, Chabuk was a wrongdoer per se.[11]

The court found an objection and a curative instruction could not obviate the improper pervasive and prejudicial misstatements.

It is the court's firm belief that the repeated characterization of Chabuk's actions as falling below his legal obligation at every conceivable point in time, the repeated misstatements of the concept of alternatives to the use of force by suggesting, et al, it was a continuing obligation falling upon Chabuk even before "the moment of self-defense", and the suggestion that Chabuk was the party responsible for the aggression exhibited by Kiener was all prejudicial to such an extent that it would not have been remedied by an objection or curative instruction, and that it affected the Jury's verdict.[12]

The record supports the trial court's conclusion that the prosecutor misstated the law by arguing Chabuk had the heightened duty of "an absolute obligation" to warn Kiener that he had a gun and call 911.

The State cites State v. Stockhammer, 34 Wash. 262, 267, 75 P. 810 (1904), to argue the prosecutor did not misstate the law by telling the jury that a "warning should be given." But six years later in State v. Phillips, 59 Wash. 252, 256-57, 109 P. 1047 (1910), the Washington Supreme Court held that instructing the jury "that a person against whom a murderous, felonious assault is committed with a deadly weapon must retreat or give warning, before taking the life of his assailant in self-defense, . . . imposed upon him a burden which the law does not sanction."

---

[11] Emphasis in original; italics omitted.
[12] Italics omitted.

25

First Aggressor Argument

The State argues the prosecutor did not make an improper first aggressor argument. The State asserts the prosecutor properly addressed the facts and circumstances that led to the shooting. The record supports the trial court's conclusion that the prosecutor improperly argued Chabuk provoked the altercation and was the first aggressor.

An aggressor who provokes an altercation in not entitled to assert self-defense unless he "in good faith first withdraws from the combat at a time and in a manner to let the other person know that he or she is withdrawing or intends to withdraw from further aggressive action." State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999).

The State proposed the court give the following first aggressor jury instruction:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

The court rejected the request. The court ruled that giving a first aggressor instruction is not "supported by the facts in this case."

> It's clear and I think it's agreed that there was a withdraw from what took place initially at 2718 [Nevada Street]. Moreover, I would find that it would seem that, or I don't see any reading of the facts as they took place at the first location that even evidenced an act likely to provoke a belligerent response as it talks about in the instruction anyway.
> And as the two gentlemen came up the stairs towards Mr. Chabuk, the only issue of contention seems to have been the allegation that Mr. Chabuk did something to someone's property. I don't think we ever really learned specifically what the concern was, but I think it was made clear that it wasn't Mr. Kiener's property in any event. And as Mr. Chabuk continued to back away filming it, he ultimately fired the shots that gave rise to the charges here.

26

The court found the prosecutor repeatedly and "improperly characterized" Chabuk as "the de facto first aggressor" throughout the entire encounter.[13] The findings state:

> The state's closing arguments regarding alternatives to the use of force included an assertion that an alternative to the use of force would have been for Chabuk to have not gone to the party house where he believed there was an altercation or, once having gone there, to say upon viewing the situation "Look, I'm sorry. I thought there was a problem here" and then to depart peacefully. But the issue of alternatives to the use of force in self-defense was not and could not have been an issue during the time at the party house because there was no testimony to even remotely indicate that Chabuk felt fearful at this time, nor did he take any action in self-defense until long after Kiener began pursuing him.
>
> The law allows one to protect oneself against imminent harm. The discussion of what constitutes imminent harm, or when a person believes he is "about to be injured", must relate to the moment when the decision is made . . . ["]the moment of self-defense", it may be called. The state acknowledges this at one point in closing by saying ["]the critical time is at the first shot", but <u>repeatedly casts blame upon Chabuk for his actions not only during his retreat up the walkway (I note again that retreating was something he had no legal obligation to do), but also during the initial contact at the party house. The state attempted to characterize all of Chabuk's actions as being an effort to confront, to provoke, and to incite anger, and did so throughout the trial,</u> including closing argument, and <u>repeated this characterization at the motion for a new trial. In this context, the court finds that the state's arguments were virtually indistinguishable from a "first aggressor" argument.</u> . . .
>
>  . . . .
>
> Indeed, this final approach towards Chabuk is that which in the law could be considered "the moment of self-defense"—the moment when a reasonable person would most likely form a belief as to whether or not harm was imminent. Chabuk did not use force of any kind before that moment. Yet the state maintained . . . that Chabuk needed to consider alternatives to the use of force not just at "the moment of self-defense", but also back at the party house, and that this obligation continued during the entire time that he "knew they were following him."[14]

---

[13] Italics omitted.

[14] Emphasis added; first alteration in original.

The record supports the court's findings of fact and conclusion that the prosecutor improperly and repeatedly characterized Chabuk as the first aggressor.

The prosecutor argued the evidence showed that when Chabuk approached the group on the lawn at Kiener's house, Chabuk starts videotaping on his cell phone "before [he] said anything" and shines his flashlight at the group:

> It was dark at this point and the video is very dark and the light from the flashlight and the light from the camera did not project well enough to light up what was before it.
>
> But at that point, and we had testimony from [Buckley], from [Kiener], from [Walker] and from [Smith] that the defendant was shining the flashlight and was filming and the flashlight was in their eyes and they didn't know who he was, didn't know who Danielle Shook was. And he kept on filming and was talking to them and asked them — it all starts off in the video and you will hear this, is what are you doing and that's what he is asking and he is asking that as he is videotaping and as he is shining the flashlight on them.
>
> . . . .
>
> . . . [T]he evidence shows clearly that if you want to irritate people, a very good way to do it is to approach them, shine a flashlight on them, and then take a picture of them and ask them what they are doing when they are in that yard, that had that effect in this case. That would have had that effect, I would submit, when you look at the evidence, whether the people were drinking or not.

The prosecutor told the jury Chabuk was responsible for the altercation:

> What is necessary. And what should someone do before they use deadly force? What efforts do you have to do? What alternatives do you have? [Chabuk] starts off [in the second video] by saying, "Yeah, so what were you saying?" He has his flashlight and he has his camera, and he could tell from the first time, the first video and the flashlight and the camera upset these people. That would upset anybody enjoying themselves in their yard and private area, someone comes up and shines lights and takes pictures. . . .
>
> . . . .
>
> . . . [T]his started because he actually intruded on these people's use of their yard. They were in their yard. There was no huge problem going on by any stretch of the imagination. He videotaped them. Filmed them. He had a flashlight in their face, which certainly was guaranteed to irritate people.

28

At that point when they could tell they were being irritated, all they would have had to have done is say, "Look, I'm sorry. I thought there was a problem here. Excuse me. There was not a problem. We heard some shouting and I thought there was a real concern. Please go on and I will leave."

Instead he did something, you recall he made this real complicated statement about turning around near the car and that's when [Kiener] thought he had done something to the car. He could have explained that. He could have engaged them in conversation. He could tell they were intoxicated, but he did not try to do that. So what does he do? He goes down and does the same thing that irritated them at the beginning. He starts filming and shining the flashlight at them. He did not look at a reasonably effective alternative.

At the end of closing argument, the prosecutor reiterates that Chabuk was responsible for provoking the altercation with Kiener:

To look at that, what alternatives, what reasonably effective alternatives could have been embraced by the defendant all the way through this? When you look at this in the beginning, this started because he actually intruded on these people's use of their yard. They were in their yard. There was no huge problem going on by any stretch of the imagination. He videotaped them. Filmed them. He had a flashlight in their face, which certainly was guaranteed to irritate people.[15]

In rebuttal argument, the prosecutor told the jury:

There were reasonable alternatives. He could have talked to him. He didn't need to have this confrontation down further near his property. He could have handled it as he went down there. He could have diffused this. He did not try. He kept on filming. He kept on videoing.

The prosecutor argued:

On this night he was the one that occasioned this entire situation by intruding on to these people. He didn't have to do that. When they were across the street, he could have very easily seen that there was not a problem and all he had to do was use the phone that he had for the purpose that it was and that was to call and call 911. It would have been plenty of time for the police to come if something had gone on and there would have been plenty of time when he walked away after he had been filming these people to call the police. He never did it.

---

[15] Emphasis added.

The prosecutor's repeated assertions that Chabuk provoked the altercation support the trial court's conclusion that the argument was improper.

Prejudice

The State argues the court erred in concluding there was a substantial likelihood the misconduct affected the jury verdict because a timely objection and curative instruction to the jury could have addressed misleading arguments or misstatements of the law.[16] Where, as here, the defense attorney "fails to object or request a curative instruction at trial," the issue of prosecutorial misconduct is waived unless the conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Lindsay, 180 Wn.2d at 430.

Here, the trial court found the prosecutor's comments during closing argument "inaccurately stated the law and did so to such an extent that a curative instruction would have been to no avail." The court concluded the pervasive misconduct and repetitive misstatements during closing argument had the "substantial likelihood of affecting the jury's verdict."

The trial court's findings of fact and conclusions of law state, in pertinent part:

3. Some of the state's comments in its closing argument inaccurately stated the law and the court concludes that this was done to such an extent that a curative instruction would have been to no avail, and this had a substantial likelihood of affecting the jury's verdict.

4. By telling the jury that the defendant had an "absolute obligation" to tell Josh Kiener that he had a gun and that he "was willing to use it," the State misstated the law, and the court concludes that this misled the jury and prejudiced the defendant.

---

[16] The State also asserts the court did not find the prosecutor's conduct was ill intentioned. But the focus is "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762.

5. The state's misrepresentations of the law were not limited to closing argument, and such misrepresentations were flagrant and prejudicial and almost certainly had a cumulative impact on the jury. The court concludes that these improper and prejudicial statements could not have been cured by instructions and the court finds a substantial likelihood that they affected the jury's verdict.

6. The state misrepresented the law of use of force and imminent harm. The state also improperly characterized the defendant as the de facto first aggressor in that the state maintained that the defendant had created the situation entirely by his own conduct and by arguing that he also had a duty to diffuse the situation, insisting that this duty continued while he was being pursued during his retreat up the dark walkway to his residence. This theme was pervasive throughout the trial (examples from the state's arguments include, in opening: "the evidence will tell you it irritated them", in closing argument: "this started because he actually intruded on these people's use of their yard . . . he videotaped them, filmed them. He had a flashlight in their face, which certainly was guaranteed to irritate people", and in rebuttal: "on this night he was the one that occasioned this entire situation by intruding on to these people"). The court concludes this was prejudicial, and the fact that a first aggressor instruction was not given does not overcome that prejudice.

7. The court finds that the state's repeated assertion that defendant's actions consistently fell below defendant's legal obligations, the state's repeated misstatements of the concept of alternatives to the use of force, and the state's suggestion that defendant was the party responsible for the aggression exhibited by Kiener were all prejudicial and the court concludes that this was prejudicial to such an extent that it would not have been remedied by an objection or curative instruction, and that it affected the jury's verdict.

8. A jury is presumed to follow the law as provided by the court and is instructed that the law is contained not in the argument of counsel but in the court's instructions. But in this case the court is compelled to conclude that the arguments and the assertions of the state as outlined in the court's opinion letter distracted the jury and misstated the law to such an extent that it is inconceivable that the jury was not prejudiced thereby and without question this had a substantial likelihood of affecting the verdict of the jury and that certainly their combined effect operate to buttress the court's conclusion that a new trial is mandated.[17]

---

[17] Italics omitted; alteration in original.

"An objection is unnecessary in cases of incurable prejudice" because " 'a new trial is the only and the mandatory remedy.' " Emery, 174 Wn.2d at 762 (quoting State v. Case, 49 Wn.2d 66, 74, 298 P.2d 500 (1956)). And " 'the cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.' " Glasmann, 175 Wn.2d at 707 (quoting State v. Walker, 164 Wn. App. 724, 737, 265 P.3d 191 (2011)). We conclude the record supports the trial court's findings and the trial judge was "in the best position to determine whether the prosecutor's actions were improper and whether, under the circumstances, they were prejudicial." Ish, 170 Wn.2d at 195-96.

However, even if a timely objection and curative instruction could have obviated any prejudice, the uncontroverted record supports ineffective assistance of counsel. We review claims of ineffective assistance of counsel de novo. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To establish he received ineffective assistance of counsel, Chabuk must show (1) that defense counsel's conduct was deficient and (2) that the deficient performance resulted in prejudice. Grier, 171 Wn.2d at 32-33. Here, defense counsel did not object to improper questions, misleading arguments, or misstatements of the law either during the cross-examination of Chabuk or at any point during closing argument. The record does not indicate that the failure to object was a legitimate trial strategy or tactic and we conclude the record establishes a reasonable probability that absent counsel's unprofessional errors, the result of the proceeding would have been different. Grier, 171 Wn.2d at 33-34.

We affirm the order granting a new trial and conclude Chabuk's attorney provided ineffective assistance of counsel that resulted in prejudice.

_Schindler, J._

WE CONCUR:

_Smith, J._                              _Andrus, J._